## Woodmen of World Life Ins. Soc. v. Parish.

March 24, 1942.

142

Charles Ferguson for appellant.

R. B. Dycus, J. R. Wells and H. Pate Wells for appellee.

OPINION OF THE COURT BY JUDGE RATLIFF—Reversing.

On May 10, 1937, the appellant issued to Dewey S. Parish an insurance policy insuring his life in the sum of $500 in which James E. Parish, father of the insured, was named beneficiary. The insured died February 1, 1939, and soon thereafter proof of claim was made and presented to appellant. Appellant refused to pay the claim and thereupon James E. Parish brought this action to recover of appellant the sum stipulated in the policy.

Appellant defended upon the grounds that (a) the insured made false statements or answers to questions in the application for the policy which were material to the risk, and (b) the insured died as a result of alcoholic poisoning which voided his claim under the terms of the insurance policy. By subsequent pleadings issues joined

on the defenses indicated above and a jury trial had which resulted in a verdict and judgment thereon in favor of the plaintiff for the amount sued for. This appeal follows.

On motion of appellant appellee filed the proof of death certificate which showed on its face that the insured died as a result of alcoholic poisoning or acute alcoholism. Appellant insists that the court should have sustained its demurrer to the petition since the exhibit filed therewith showed that the insured's death was caused by alcoholic poisoning, appellee showed no right to recover under the terms of the policy.

We do not think the fact that the notice and proof of death showed that the insured died from alcoholic poisoning rendered the notice and proof of death defective or precluded the appellee from litigating his claim, since a cause of death recited in a death certificate is an unnecessary narration of fact and the death certificate is complete without such narration. Connecticut Mutual Life Ins. Co. v. Siegel, etc., 9 Bush 450, 72 Ky. 450. Furthermore, after the appellant filed its answer in which the death certificate filed with the petition was pleaded as a defense, appellee filed his reply in which he attacked the correctness of the death certificate and averred, in substance, that the cause of the death of the insured was not actually known at the time the death certificate was made out and the cause of death recited therein was mere speculation and guess. In the circumstances if it be conceded that the exhibit rendered the petition demurrable, yet we think the subsequent pleadings cured the defect, if any there was. The court did not err in overruling the demurrer.

We now come to consideration of the evidence pertaining to the issues of whether or not the insured was addicted to alcoholic drinks before and at the time he made application for the insurance policy, and whether or not his death resulted from the use of alcoholic liquors. The appellee (plaintiff below) testified that he signed the death certificate which showed that his son died as a result of alcoholic poisoning but he said he did not fill out the certificate and did not know what was in it but just signed it with the doctor. In reference to the condition of the insured on the night he came home and on which he died, he said he was unconscious and could not talk but he did not know what was the matter with

144

him; he said he came in with Travis Browning and Happy Parish and that they had been to Paducah and had returned from the second trip to Paducah on that day; that he started back on the last trip about 6 p. m. and returned at about 1 o'clock on the next morning; that he did not know whether or not he was drunk. He was asked if he smelled whisky on him, and instead of answering this question directly he answered, "He died in just a few minutes." He was further asked: "Was your son a drunkard?" and he answered, "He drank some." Upon the same question being repeated his second answer was: "Not what you would call a regular drunkard." He was asked a number of questions in regard to his son's habit of drinking and he seemed to be somewhat evasive and indefinite but admitted that he had seen his son intoxicated a number of times but still insisted that he was not what he considered a drunkard. He said that he and his son were not together much when the latter was drinking and that he would usually go to bed and he did not know much about it, but said that he had seen him drunk a few times in his life.

Dr. J. W. Robinson testified that he was called to the home of James E. Parish, father of the insured and with whom he lived on the night of the 31st of January, 1939, or in the early morning of February 1, and he found the insured in a dying condition. He said he administered morphine and strychnine to him in an effort to stimulate his heart but got no reaction from it and that his pulse got slower instead of faster. He further stated that the symptoms he observed might have been produced by various kinds of poisons. The doctor further testified that from his personal knowledge of the insured and from information he got from the insured's friends and associates which he obtained for the purpose of diagnosing the case, he decided that the main cause of the insured's death was alcoholic poisoning. He further said that an autopsy was had on the body and some of the contents of the stomach were removed and he saw his liver and it seemed to be enlarged but he considered it a congested liver which is very common in men who drink but that he considered that the congested liver condition had but very little to do with the cause of his sudden death. On cross-examination the witness was asked to state in his professional opinion whether the insured died from excessive use of alcohol and he answered, "Some poison, and from all the facts I can get, I don't know what else it

could be but alcohol.'' He further stated that he knew that the insured was a chronic user of alcohol and had been for a number of years. He was asked if the insured had been a chronic drinker for more than five years at that time, and he said he did not know about that far back, and further said, ''I just don't remember definitely, but the boy did drink pretty heavy.'' It appears that the witness based his testimony to some extent upon rumors and the reputation of the insured for drinking, but said that he personally knew about some of it and had seen him when he was drunk to the point where he would stagger and knew that he had been drinking for many years and that he was drunk on that occasion. On cross-examination the witness was asked about information he received concerning insured's habits of drinking and especially on the day of, or previous to, his death, to which appellee objected, and the court permitted the witness to testify to matters told him by the friends and associates of the insured to help him in the diagnosis of the case. The witness said:

> ''Happy Parish came after me about one, between twelve and one is the way I remember, and he said to go and see Tud, said, his mother thinks he's about to die. And he said 'I think he's just drunk and he will be all right, but I want you to satisfy his mother.' I said 'how much did he drink,' and he said 'he's been drinking all day.' We know literally he didn't drink all day so you can interpret what he meant. * * *

> ''Well, his brother thought he would sleep it off in a few hours, and he came after me and I went there. He said he drank a couple of pints of liquor, to his knowledge, that's what Happy told me. After that, they seemed to change their mind about it the next day. He said they had been to Paducah.''

It is to be noted that in the quotation above the witness referred to Happy Parish as a brother of the insured, but he later stated that he was a cousin of the insured.

It is the recognized rule that a doctor may testify to statements or a history of the case given to him by the patient when made solely for the purpose of enabling the doctor to treat the patient, when such statements are not self-serving or made for the purpose of qualifying the

doctor to testify as a witness in behalf of the patient. But, we know of no authority for extending the rule so far as to permit a doctor to testify to statements made by third parties concerning the patient. It may be conceded that it was improper to permit the doctor to testify to the statements made to him by Happy Parish. Had Happy Parish been called as a witness and asked about the statements and had denied making them, then the evidence of the doctor that he did make such statements would have been competent for the purpose of showing that Happy Parish made contradictory statements. But in view of Dr. Robinson's evidence as a whole, it is doubtful that his testimony relating to the statement of Happy Parish could have been prejudicial, since the doctor testified from his own personal knowledge and observations of the insured and knew he had been an habitual drinker of alcoholic whisky and that he was drunk on the occasion he was called to see him and that he was suffering from a poison of some kind, and stated that in his opinion he died as a result of alcoholic poisoning. It is thus seen that the information the doctor received from Happy Parish was nothing more than the doctor already knew with respect to the insured's habit of drinking for the past several years, and that he was drunk on that occasion and was suffering from a poison.

R. B. Chandler, field agent or representative of appellant company who took the application of the insured, testified, in substance, that he had known the insured a number of years, and when asked if the insured was an habitual drunkard or addicted to the use of alcoholic liquors, and whether or not he ever had delirium tremens, he answered, "Not to my knowledge." It also appears that Chandler recommended the issuance of the policy or insurance certificate in question. The evidence of this witness with respect to the insured's habit of drinking is of a negative nature and does not tend to contradict the positive evidence of Dr. Robinson and the plaintiff, father of the insured, whose evidence is definite and certain that the insured was an habitual drinker of alcoholic liquors and had been for many years.

Travis Browning, who was with the insured on the day previous to his death, testified concerning the trips made from Livingston to Paducah on the day previous to the insured's death. He said that the insured took one drink of gin and a part of a bottle of beer and that was

all he saw him drink on that day; that he appeared to be well, was singing and dancing, and he observed nothing wrong with him until later in the evening when he stopped at a spring and he detected an odor which was very noticeable and concluded that there was something wrong with him and he tried to arouse him and could not and decided to take him home or to a doctor, and took him to the home of his father and Happy Parish went after the doctor. He said the doctor asked him if the insured had been drinking but he did not remember what he told the doctor because he was excited. He was asked and answered these questions:

"Q. You and Happy Parish told the doctor what he wanted to know? A. Gave him an idea.

"Q. And then the doctor gave him something, a hypodermic? A. Yes."

Loy Kennedy, an undertaker or funeral director, testified that he was called to the home of plaintiff soon after the death of the insured and he observed a white purge mixed with blood coming from the nose which apparently originated from his lungs. At that time the court sustained objections to the witness' evidence and would not permit him to express an opinion as to the cause of the insured's death. Later, however, the same witness was called in rebuttal and after stating his schooling and training as an undertaker and experience in the handling of dead bodies and the diagnosis and cause of death, the court permitted him to testify apparently as an expert witness. He testified to certain symptoms he observed and said that it was an indication of acute indigestion. We do not think the evidence of this witness has any material bearing on the question of the cause of the death of the insured.

The appellant introduced as its witnesses L. L. Bridges, police judge of the town of Grand Rivers, and Fay Wells, policeman of the same town. Both of these witnesses, testifying from the police court records, testified that on March 16, 1938, the insured was fined on a charge of being drunk in a public place. The police judge said that the insured pleaded guilty, and further said that he was drunk on that occasion. It was also shown that the insured was again fined in the same court on a charge of being drunk in a public place in August, 1938, and another like charge on December 26, 1938. The

policeman testified that he made the arrests on some of those occasions and that the insured was drunk to the extent that he arrested him without a warrant.

Appellee insists that there is no evidence tending to show that the insured indulged in the excessive use of alcoholic whisky previous to April 20, 1937, the time he made application for the insurance policy, and therefore appellant completely failed to show that the insured made false answers to the questions contained in the application. We are unable to agree with appellee in this contention. The evidence of appellee shows that the insured was a frequent user of alcoholic whisky previous to April, 1937, but perhaps not to the extent that might be considered excessive, but the uncontradicted evidence of Dr. Robinson is much stronger. It is shown by his evidence that the insured drank whisky not only frequently but to a point that might be considered excessive for a number of years previous to April, 1937. It is true that the doctor said that he had heard of the insured drinking but, discarding this evidence as being incompetent, it must not be overlooked that the doctor testified that from his personal knowledge and observations of the insured he drank a considerable amount of whisky for several years previous to his death and before April, 1937.

As to the question of the cause of insured's death, appellee insists that the evidence was such that the jury had the right to form a different conclusion from the doctor as to the cause of death or from the doctor's report as to the cause of death, citing Pacific Mutual Life Insurance Co. v. Cash, 224 Ky. 292, 6 S. W. (2d) 239; Kentucky Central Life & Accident Insurance Co. v. Jones, 247 Ky. 432, 57 S. W. (2d) 72; Guardian Life Insurance Co. v. Robison, 278 Ky. 678, 129 S. W. (2d) 192. In each of the above-cited cases there were two probable causes shown, either of which might have resulted in the death of the insured involved in those respective cases, and each cause was supported by evidence of a substantial nature. In such circumstances we held that the jury had the right to decide which cause brought about the death of the insured. The case at bar presents a different situation. Appellee denied that the insured died from alcoholic poisoning but does not even attempt to show any other cause which might have produced his death. It is true that Kennedy, the undertaker, indi-

cated that the insured might have died of acute indigestion, basing his opinion upon certain symptoms he observed. We do not think this contradicts the evidence of Dr. Robinson, since it is not shown that such symptoms would not have been produced by alcoholic poisoning. We do not think that the evidence of the undertaker amounts to more than a scintilla, which was insufficient to take the case to the jury.

Since substantially all the evidence relating to the cause of insured's death shows that it was the result of alcoholic poisoning and no evidence of any other cause that might have produced death, we do not think the jury had the right to ignore the only cause of death claimed and which was established by evidence of a substantial nature, and enter the realms of speculation and assume that death resulted from some unknown cause. Upon another trial of the case if the evidence is the same or substantially the same as that in the present record, the court will peremptorily instruct the jury to find a verdict for the appellant.

For the reasons indicated, the judgment is reversed and remanded for proceedings consistent with this opinion.