# Kentucky Central Life & Accident Ins. Co. v. Jones.

(Decided Feb. 7, 1933.)

PETER, LEE, TABB, KRIEGER & HEYBURN AND CARY TABB for appellant.

BEN F. GARDNER, NELSON M. WILLIS, and J. EVERETT HARRIS for appellee.

OPINION OF THE COURT BY CREAL, COMMISSIONER—
Affirming.

In October, 1922, the Kentucky Central Life & Accident Insurance Company issued to Charles Jones, colored, a policy which among other things insured him against "death resulting directly and independently of all other causes through external, violent and accidental means (excluding suicide—sane or insane) provided death of the insured occurs within (90) days from date of accident." Rinda Nichols Jones, wife of the insured, was named as beneficiary in the policy.

On December 26, 1930, and while the policy was in effect, insured is alleged to have sustained injuries in an automobile accident, and his death followed on January 21, 1931.

Rinda Nichols Jones, the beneficiary, instituted this action in the Jefferson circuit court seeking to recover on the policy, and in her petition, after setting out the foregoing facts, alleged that the injuries sustained by insured in the automobile accident directly and independently of all other causes resulted in his death; that proof had been made and furnished the company in accordance with the provisions of the policy, but that payment had been refused. The issue, as made by answer of the company, in which it denied that it was indebted to plaintiff in the sum sued for or in any sum, was tried before a jury, and resulted in verdict and judgment in favor of the plaintiff. The company has appealed.

The only ground argued for reversal is that the evidence was not sufficient to take the case to the jury or to support the verdict; therefore the court erred in not sustaining appellant's motion for a peremptory instruction.

It is shown by the evidence that a Ford truck driven by insured came in collision with a Dodge touring car, and both were damaged to such an extent that they had to be towed to a garage for repairs. None of the witnesses introduced saw the accident, but saw the automobiles immediately thereafter. The truck was overturned, and, while it does not appear whether insured was under or pinned beneath the wreck, there is evidence that he did not get out until the truck was lifted up by others. One witness who conducts a dairy

near the scene of the accident testified that he could not tell whether insured was injured, but that he appeared to be badly frightened and could not talk. He and others testified that he leaned up against the dairy building. Joe Smith testified that immediately after the wreck he received a message from insured to come and get him and the truck; that he went out on the road that morning, but failed to find either insured or the truck. He went out again in the afternoon, and met insured near the 8-mile house driving along very slowly toward his home; that he got in the truck, took him home, and helped to take him out of the truck and into his house; that he appeared to be very sick and complained of his head and side hurting; that he saw insured every day thereafter until his death, but never saw him out of bed. H. H. Schmitt, one of the proprietors of the garage where the automobiles were taken, testified that insured was around the garage practically all the time until the repairs were completed; that he walked around holding himself and complaining of his side and· back.

Appellee testified that her husband was on his way from his home at Rosedale to the L. & N. car shops where he was employed when the accident occurred; that he was apparently in good health. She testified that about a year before the accident her husband went to Dr. Heman Humphrey for treatment; that the doctor put him on a diet and treated him for about 2 weeks, when he seemingly recovered, went back to his work, and was not off again until the accident; that, when she first saw her husband after the accident, he had bruises at the back of his head, on his chest, and on the small of his back, a cut on his leg, and a bruised and dislocated shoulder; that he complained mostly of his back and head; that immediately before he died he grabbed and held his head.

The general superintendent at the car shops testified that insured had worked under him in the boiler room for about 9 years previous to the accident; that he never lost any time, was very active and apparently a vigorous man.

Dr. Maclin, a colored physician, who was called and treated insured after the accident, stated that he found discolorations on the left chest, on his shoulder, on his back in the region of the kidneys, and on his leg,

and that the shoulder was quite swollen; that he found no discoloration about the head or neck, but that the patient complained quite a bit of his head; that he strapped his shoulder with adhesive and prescribed palliative treatments; that he knew insured prior to the accident and 'that he was a stout and what might be called an active man. He stated that insured seemingly improved after the accident, and, when asked as to the cause of his death, replied, ''Well, I would not say what he died with, it was rather unexpected to me.'' He attended an autopsy held a day or so after the death of insured and after the body had been embalmed; no examination was made of the head. He noticed no swelling of the ankles, but the kidneys were considerably enlarged, and there was inflammation of the muscles of the heart and myocarditis. He testified that Bright's disease could be produced by a traumatic injury, but gave as his opinion that it could not have reached the stage indicated by the autopsy within the 26 days between the accident and the death of the patient. He stated that myocarditis could be produced from injuries and might develop within the 26 days from the injury. He testified that insured was overnourished and had lost no weight. He gave his opinion that the accident was not the cause of myocarditis or the Bright's disease.

The undertaker and embalmer who had charge of the body testified that from their experience in embalming and seeing bodies embalmed they could detect a dropsical condition, and that there was nothing to indicate such a condition in this instance, but that the blood appeared to be healthy and normal.

Dr. W. Stewart Carter performed an autopsy in the presence of Drs. Roy Carter, Heman Humphrey, and S. W. Maclin. Dr. Humphrey testified that about a year before the death of the insured he treated him at his office, and that he was suffering from chronic heart and kidney disease and dropsy, his feet, limbs, and abdomen being very much swollen; that he gave him what is called the Karelle cure, which consists in starving the patient both as to food and water, allowing him about a pint of milk and a little coffee and a great deal of salts, which often relieves dropsy temporarily; that he got much better and was able to go back to work; that the autopsy revealed a large fatty heart with the

muscles flabby and diseased, and the normal secreting structures of the kidneys replaced by scar tissue; that he did not see any evidence of injuries caused by the accident. He gave as his opinion that the cause of the death was chronic heart and kidney disease; it being impossible to say whether the heart or kidneys contributed the more. He further testified that myocarditis or nephritis, commonly known as Bright's disease, could not be produced by traumatism, unless there was direct injury to the heart or kidneys, but stated the acute nephritis could develop within 26 days. The other doctors' evidence as to the condition of the heart and kidneys was in substance the same as that of Dr. Humphrey. Drs. Carter testified that in their opinion the condition of the heart and kidneys was not of recent origin and could not have been caused by the accident, and that insured died of heart disease. The doctors testified that one afflicted with heart and kidney disease might live for years.

Counsel for appellant cite and rely on the case of Ætna Life Insurance Company v. Bethel, 140 Ky. 609, 131 S. W. 523, 529, and other cases of like import as supporting their assertion that, to warrant the submission of the case to the jury and to support the verdict, it was indispensable that the evidence show that the accident, independent of all other causes, produced the death of insured; and that the evidence was too loose and inconclusive to establish the facts alleged and sought to be proved.

While the rule enunciated in the cases cited will govern in a decision of this case, it must be remembered that seldom, if ever, are the facts in cases growing out of different accidents identical, and the application of established rules to the facts in the one case may warrant an entirely different conclusion from that reached by their application to the facts in another.

In the Bethel Case it was alleged, and there was evidence indicating, that in alighting from his buggy Dr. Bethel sustained a fall, and his head came in contact with the paved street, as was evidenced by some contusions or bruises. The accident occurred on April 6, and on April 8 Dr. Hancock was called and diagnosed his trouble as autointoxication, and within a few days the patient's condition had become so alarming that two

other physicians were called in consultation and concurred in Dr. Hancock's diagnosis. The evidence established that, prior to the fall, Dr. Bethel had suffered an attack of autointoxication. Dr. Hancock testified that autointoxication which caused Dr. Bethel's death was superinduced by the fall; however, it was pointed out by the court that, when he called the other doctors in consultation, he did not attach enough importance to the fact to call their attention to it.

A comparison of the foregoing with the facts in the case at bar at once reveals a marked dissimilarity. If the doctor who was called after the accident and who continued to treat Charles Jones until his death had diagnosed his trouble as myocarditis or nephritis or a combination of the two, and had called other eminent physicians who concurred in his diagnosis, the cases could not be so readily distinguished. Dr. Maclin's evidence discloses that he treated insured for injuries resulting from the accident, and not only so, but he made out or signed reports to the insurance company showing injuries sustained by the accident. He failed to discover any evidence or symptoms of the disease which the doctors say was the cause of the death until he witnessed the autopsy. The opinion of the doctors that death was due to heart or kidney disease or to both is based on conditions found 3 days after the death when the body had been embalmed and on the evidence of Dr. Humphrey that he had treated insured for kidney trouble about a year prior to the accident. In the autopsy no examination or exploration of the back of the head or of the neck was made.

On the other hand, the evidence is conclusive that insured was in an automobile accident, and that he sustained severe and painful injuries evidenced by visible marks as hereinbefore enumerated. He was confined to his bed until the date of his death, and suffered pain in his back and head. That there was an injury to the head which caused intense pain is indicated by evidence that immediately before his death he grabbed his head and died with it clutched in his hands. On the morning of the accident, and for some months prior thereto, insured, according to evidence, was a strong, active, and vigorous man and to all appearances in good health.

The Bethel Case quotes with approval the follow-

438

ing from Fidelity & Casualty Co. v. Cooper, 137 Ky. 544, 126 S. W. 111:

"If the injury or death is due to an accident, without the intervention of any diseased condition of the body, the company is liable. It is not liable where the injury or death happened in consequence of the disease or bodily infirmity, and not of the accident, or, where it is due both to the accident and the disease. But where the accident, and not the diseased condition, is the proximate cause of the death, the company is liable."

In the Cooper Case, the court, in referring to a provision in the policy similar to the one under consideration here, said:

"While under the policy the defendant is not liable unless the accident results in death 'directly, independently and exclusively of all other diseases,' this does not mean that the defendant is not liable where the accident is the direct, natural, and proximate cause of the death."

While it was competent for the doctors to testify as to conditions revealed by autopsy and as experts to express their opinions as to the cause of the death of insured, the jury in their province was at liberty to reach a contrary conclusion. Pacific Mutual Life Ins. Co. v. Cash, 224 Ky. 292, 6 S. W. (2d) 239, 241. This they did, and in the light of the evidence we might say as was said in the Cash Case, supra:

"No one can say with absolute assurance of accuracy that the death of (Jones) did, or did not, result directly from the accident, independently of the disease, and exclusively of its effects."

Unquestionably there was ample evidence to take the case to the jury and to support the verdict rendered by them.

Judgment affirmed.