## Shell et al. v. Town of Evarts et al.

Feb. 11, 1944.

R. L. Pope and R. S. Rose for appellants.

Carter & Hogg for appellees.

OPINION OF THE COURT BY PERRY, COMMISSIONER—
Reversing.

This action on the case was brought by the appellants in the Harlan circuit court to recover of the appellees damages for the negligent construction and operation of a reservoir, by reason of which it burst and resulted in overflowing and damaging appellants' property, situated on the hillside below.

A trial of the cause resulted in the court's entering, at the conclusion of the introduction of evidence for plaintiffs, a directed verdict in favor of defendants. From the judgment entered on that verdict, this appeal is prosecuted.

Appellants, who were the plaintiffs below, allege in their petition that they are the owners of a certain hillside lot, together with two houses thereon, situated in the town of Evarts some 250 or 300 feet directly below an improvised mine reservoir located at the top of the hill, which is maintained and operated by the town, with the permission and license given it by its owners, for the purpose of furnishing a water supply for the use of its citizens and fire protection of their property.

The petition further alleges that the town, following its construction of a new pipe line, connecting the town's waterworks with this old mine lake, negligently constructed a dam or retaining wall at the mouth drift of this old, abandoned mine for the purpose of impounding and holding back the large volume of water that had accumulated therein. It also alleges that this dam was negligently constructed of mud, sticks and other improper substances, rendering it defective and of insufficient strength to withstand and hold back the pressure of the large volume or lake of water which had accumulated in the mine following its long abandonment and that by reason thereof, within a few months following its improper construction, it suddenly broke, turning loose the impounded lake water, which rushed in a torrent ᴒ vn the hill, striking, overflowing and damaging ₚ⁻ 's' property.

Aₚₚ 'ees filed answer, first traversing each and every allegation of the petition, other than that in which plaintiffs pleaded their ownership in fee of the property which they claimed was damaged by reason of the bursting of the negligently built reservoir. Further, the defendants denied that they or either of them had at any time maintained a reservoir or dam from which water was supplied the town of Evarts and further averred that "if plaintiffs had sustained any damage to their property," it was through no fault of the defendants and that if any water flowed onto the property of the plaintiffs, it was water which came out of the abandoned mines near the property and was the result of an act of God.

By reply to the answer plaintiffs denied that "God had anything to do with the injury to their property described" and also that it was an act of God that caused the injury.

The proof offered by the appellants in support of their claim, that their property in question had been overflowed and damaged by the sudden breaking of the reservoir, is to the effect, as alleged in their petition, that the appellees had negligently constructed out of improper materials, consisting of old ties, rails, wire and mud, a dam at the mouth of the old mine, by reason of which it proved to be a defective structure, of insufficient strength to withstand and hold back the weight and pressure of the large volume of water impounded in the

mine, by reason of which, as was to be reasonably expected, the dam, within a short time following its construction, suddenly burst, turning loose the pent up waters of the reservoir in a torrent, which rushed down the hill, overflowing, washing away and damaging plaintiffs' property.

The appellee, Frank Cawood, called as a witness for plaintiffs, testified that he was a joint owner with his co-appellee, Buck Jeffers, of this old mine property in question at the time the reservoir dam, constructed by the town, broke and flooded the hillside property of appellants, but that he did not know of the town's ever having built a dam at the drift mouth of their mine nor had he ever noticed that a dam was there.

The appellant, Mrs. Shell, testified, as was also alleged in the petition, that she and her husband were the owners and held a deed to this hillside property (therein described), which was overflowed and damaged by reason of the defendants' negligent construction of the defective dam at the drift mouth of the mine reservoir and that she warned both the workmen who were constructing the new ditch and pipe line connecting the town waterworks with this improvised mine reservoir, under the supervision and direction of the mayor and other town officials, and also some of the officials that water was leaking out below the piping and flowing through the ditch under their house in such a large volume as to wash out some of its foundation posts, but that they neither desisted nor gave heed to her warning given them, but curtly replied that they "were running their business and for her to run hers."

Further Anthony Smith, a witness for plaintiffs, stated that he was the workman who laid this new pipe in the ditch being dug by the W.P.A. crew working under the direction of the mayor and other officials of the town and which extended from the town's waterworks up to and through the old, gradually formed embankment at the drift mouth of the abandoned mine and that the pipe extended out into the lake water some 35 or 40 feet. In answer to the question asked as to what kind of construction was used to hold the pool of water accumulated in the mine he replied, "At the drift mouth, a piece or two of steel and old timber crossed in it, where clay would come off the top and rocks." He stated that there was no concrete wall constructed there to

hold the mine pool of water and when asked how large it was, he answered that the water came to the top of his hip boots; that it was two and a half or three feet deep and went as far as he could see. When asked, "Where was the earth wall that held this water?," he answered: "You might call it a wall. It is where the side track crossed from the drift mouth; a ditch in time, looked like it had been dug and cross ties were for the side track, the mines had been put in there." When he was further asked, "Did you see wire, or sticks or dirt thrown across there at the drift mouth to hold the water?," he answered: "That is what I told you about; a few old mining timbers; no wall was built; it is there in that dirt packed in between them." He was further asked, "after the dirt and water accumulated was there anything to hold that construction except what you told?," to which he answered, "That is all." When asked whether or not, while he connected the pipe, the mayor was there and saw how it was being done, he answered: "I think he was there once when they were supposed to have sent the water off; heard they were going to be condemned and they had us pull the wire and after they sent the water off, and it come back, then they had me put it back in. That was before her (plaintiff's) property was damaged." When asked, "What, if you know, having connected the pipe and did the work, caused that to break loose?," he answered: "That mountain is soft, and that ditch being dug, would give away naturally where the water would eat through it underneath the pipe; in my opinion that is what started the whole thing by it coming out of the drift mouth. It was soft dirt; we packed it the best we could; we didn't concrete it." To the question asked, "Did you know as a construction man, from having done that work, or any reasonable person that was there and saw it, it wouldn't hold it?," he answered: "There is a great lake of water back there. You take water 3 feet deep running 250 to 300 feet, there is a lot of water; it went back further." The court then asked witness, "Did you or not tell the jury awhile ago Harve Turner (the mayor) gave your boss instructions?," to which he answered: "Yes. That is right. He gave instructions to us, how to put the pipe in." Further he testified that he had notified the plaintiff, Mrs. Shell, or her husband, before her property was damaged, that there was danger to her house from the dam.

At the conclusion of the introduction of the testimony given for the plaintiffs, the court sustained the defendants' motion that the jury be peremptorily instructed to find in their favor, when a verdict was accordingly returned and judgment pronounced thereon, dismissing the action.

From this summary of the pleadings and evidence, it is apparent that the principal question presented for our consideration by this appeal is as to whether, at the time the motion for a directed verdict was made and sustained, there was sufficient evidence introduced on behalf of the plaintiffs, which was uncontradicted and unexplained by the defendants, to have authorized the court to submit the factual question to the jury as to whether or not the overflowing and damaging of appellants' property was caused by the defendants' negligent construction of an insufficient dam at the drift mouth of the mine reservoir, maintained and operated by the town and its co-appellees, Cawood and Jeffers.

We are of the opinion that the testimony of the witness, Anthony Smith, the workman who laid the pipe into the mine lake reservoir and who further participated, under the direction and supervision of the town officials, in the construction of a dam or retaining wall at the drift mouth of the mine out of mud, sticks, wire and other improper materials, by reason of which it was defective and of insufficient strength to hold back and withstand the weight and pressure of the large volume of mine water it was built to impound, clearly constituted some direct evidence of probative force tending to show that the appellee town, acting with the consent of its co-appellees, Cawood and Jeffers, did so negligently construct this drift mouth dam that by reason thereof, as was to be reasonably expected, it suddenly broke, resulting in overflowing and damaging plaintiffs' property.

The rule as to the liability of those constructing defective reservoirs, which burst by reason of their negligent construction, is, as stated in section 411, page 98, of Cooley on Torts, 4th Edition, that while "it is lawful to gather water on one's premises for useful and ornamental purposes, subject to the obligation to construct reservoirs with sufficient strength to retain the water under all contingencies which can reasonably be anticipated, and afterwards to preserve and guard it

with due care * * * for any negligence, either in construction or in subsequent attention, from which injury results, parties maintaining such reservoirs must be responsible.'' Further it is therein said that ''the American decisions seem to plant the liability on the ground of negligence, and the party constructing or maintaining the reservoir is held liable, not at all events, but as he might be if he had negligently constructed a house which fell down, or invited another into a dangerous place without warning.''

In the case of Rogers v. Bond Bros:, 279 Ky. 239, 130 S. W. (2d) 22, it is said the extreme doctrine of the English rule, as announced in the leading case of Fletcher v. Rylands, 3 H. L. 330, tĥat the person who, for his own purposes, brings on his land, and collects and keeps there anything likely to do mischief if it escapes, must keep it in at his peril; and if he does not do so, is prima facie answerable for all the damage which is the natural consequence of its escape, has been expressly rejected in Kentucky, which places the liability of one constructing a reservoir on his premises, which bursts, on the ground of negligence in constructing or maintaining the reservoir.

It here appears that the mischief or injury done the appellants' property through the bursting of the dam was the natural and to be expected result of its negligent construction, as shown by the testimony of the appellants' witness, Anthony Smith, and such being the case, we are of the opinion that the trial court erred in giving a directed verdict for the defendants.

The liability of the appellees to the appellants for injury done their property as the result of their negligent construction of the dam or the improvised reservoir was based, not on privity of contract, but on the appellees' violation of the rule declared by the ancient and just maxim, sic utere tuo ut alienum non laedas, which applies to corporations as well as individuals and trespass on the case and other forms of action predicable on negligence are within the meaning of the maxim, which voices the well-settled rule of the common law that ''a person who negligently uses a dangerous instrument or article, or causes or authorizes its use by another person in such a manner or under such circumstances that he has reason to know that it is likely to produce injury, is responsible for the natural and prob-

able consequences of his act to any person injured who is not himself in fault. The liability does not rest on privity of contract between the parties to the action, but on the duty of every man so to use his own property as not to injure the person or property of others." Meers. v. McDowell, 110 Ky. 926, 928, 62 S. W. 1013, 1014, 53 L. R. A. 789, 96 Am. St. Rep. 475.

Further, it comes within the meaning and scope of this maxim that one owning property can not permit or indirectly make such a wrongful use of it as to injure another. Therefore it follows that the appellee owners of the mine, who licensed the appellee town to negligently and wrongfully maintain and operate a dangerous and defective reservoir on their property, became alike liable with the town for maintaining it.

Therefore it follows that if the witness Smith's testimony tended to show that the appellees had here violated this duty owing appellants by making such a wrongful and negligent use of their property as invaded the correlative rights of the appellants, the court erred, we conceive, in sustaining the appellees' motion for a directed verdict, the well-settled rule in such case being that if there is any competent and relevant evidence to sustain an issue, the question should be submitted, the right of decision on every issue of fact being exclusively for the jury. Kentucky Utilities Co. v. White Star Coal Co., 244 Ky. 759, 52 S. W. (2d) 705; Bolton v. Sears, 257 Ky. 676, 78 S. W. (2d) 914. The direction of a verdict for the defendant is not authorized unless after admitting the testimony offered by the plaintiff, and every reasonable inference to be deduced from the facts proved to be true, his cause of action is yet unsupported in any degree. Nelson v. Black Diamond Mining Co., 167 Ky. 676, 181 S. W. 241; New York Life Ins. Co. v. Dean, 226 Ky. 597, 11 S. W. (2d) 417; Kentucky Traction & Terminal Co. v. Roman's Guardian, 232 Ky. 285, 23 S. W. (2d) 272; Holsclaw's Adm'r v. Louisville Gas, etc., Co., 267 Ky. 56, 100 S. W. (2d) 805; Stanley's Instructions to Juries, section 7, pages 11 and 12.

We are, therefore, for the reasons stated, led to conclude that the court erred in giving a directed verdict finding for appellees, where there was clearly some relevant and competent evidence introduced on behalf of plaintiffs tending to sustain the issue. Accordingly

the judgment entered thereon in favor of appellees is reversed and the cause remanded for further proceedings consistent herewith.