Robert N. WALDEN, Appellant,

v.

Peter H. JONES et al., Appellees.

Court of Appeals of Kentucky.

Nov. 22, 1968.

Rehearing Denied May 9, 1969.

Carl Miller, Frank S. Ginocchio, Wheeler B. Boone, Errol Cooper, Jr., Lexington, for appellant.

Stoll, Keenon & Park, Denney, Landrum, White & Patterson, Harbison, Kessinger, Lisle & Bush, Lexington, for appellees.

DAVIS, Commissioner.

In this malpractice action Robert H. Walden seeks to recover damages from Dr. Peter H. Jones, Dr. Leslie W. Blakey, and Dr. Colby N. Cowherd, based upon his claim that they negligently failed to diagnose his condition and thereby deprived him of the opportunity of submitting to an immediate operation to relieve a paralytic condition which he now suffers. The trial court directed a verdict for the doctors at the conclusion of the evidence in behalf of the plaintiff. This appeal challenges the ruling of the trial court in directing the verdict.

About 4:30 p. m. on Saturday, January 23, 1965, while engaged in playing a game of darts with his ten-year-old son, the then 33-year-old appellant experienced a stinging pain in his upper back. The pain soon subsided, and appellant finished the game. However, about 5 p. m. the pain recurred across his back and extended down both his arms and was quite severe. Appellant lay on his back, hoping for relief from the pain, but no relief came; and he feared that he might be suffering a heart attack. Dr. Earl Spencer, a general medical practitioner, was called and arranged to meet appellant at the Central Baptist Hospital in order to examine and treat him. Appellant met Dr. Spencer at the hospital about 6 p. m. where Dr. Spencer examined him and expressed the view that appellant was suffering from a respiratory virus. At that time it was learned that appellant's temperature was about 101 degrees. Dr. Spencer advised appellant that he could go home but directed that he should have a routine chest X ray made before leaving the hospital.

While the chest X rays were being undertaken, appellant experienced some jerking or spasticity in his legs. He also noted some loss of sensory feeling in his chest and back when he realized that he had no feeling on his bare chest for the X-ray plate nor any feeling on his bare back for a metal chair in which he was seated. It was necessary to make three exposures of the chest X ray in order to obtain a readable picture due to the appellant's inability to remain still during the filming. It should be noted that Dr. Spencer had left

the hospital before the chest X rays were undertaken.

Due to appellant's progressing discomforts, he decided to remain as a patient in the hospital. Between 7:30 and 8 p. m. appellant was assisted to the toilet but was unable to void. He returned to bed and realized that his thighs were becoming numb and requested that Dr. Spencer be notified of it, although it appears that no such notice was then given to Dr. Spencer. By about 8:30 p. m. the spastic condition of appellant's legs had ceased, but his legs were numb and he was unable to move them. The pain in his back and arms persisted. Under sedation, he went to sleep about 8:30 p. m. and slept until midnight when he awakened for a brief interval during which he felt that the paralysis and sensory loss and the pain were about the same as they had been at 8:30 p. m. After more sedation, appellant again went to sleep and awakened about 3 a. m. At that time the pain was gone from his arms and back. A nurse at the hospital called Dr. Spencer shortly after 3 a. m. Responding to that call, Dr. Spencer arrived about 4 a. m. on January 24, 1965. Dr. Spencer's examination of appellant at that time disclosed that appellant was unable to move his legs, and his reflexes were gone. His muscles in the affected area were flaccid. Appellant's bladder was extended with urine which condition was relieved with a catheter. Dr. Spencer's examination revealed that the respiratory muscles were not clinically impaired so that his ability to breathe was not importantly diminished. Suspecting that appellant might be suffering from poliomyelitis, Dr. Spencer procured a spinal fluid test which proved negative for poliomyelitis. Dr. Spencer was unable to make a definitive diagnosis but concluded that if the appellant's condition remained unchanged during the following few hours he should be examined by a neurologist.

When Dr. Spencer next saw appellant about noon on January 24, he noted that his condition was about the same and ad-vised that a neurologist should be consulted. Pursuant to that advice, the appellee Dr. Leslie W. Blakey, a neurologist, was called and examined appellant about 3 p. m. on January 24. Dr. Blakey expressed the belief that appellant had a tumor in the low neck area and that surgery should be undertaken immediately. Appellant readily agreed to follow Dr. Blakey's advice, which included calling in appellee Dr. Peter H. Jones, a neurosurgeon. About 4:30 p. m. on January 24, Dr. Jones, assisted by Dr. Blakey and Dr. Cowherd, a radiologist, performed a myelogram on appellant at the conclusion of which appellant and his family were informed that no tumor had been located and no surgery would be performed. It should be noted that appellant's paraplegic condition had apparently become complete by 8:30 p. m. on January 23, although he sensed some minor sensations about his feet somewhat later.

Since the steps taken and omitted during the myelogram are critical to the decision of this case, we present in some detail the account of the myelogram, although some of the facts we shall discuss appear in discovery depositions only and were not in evidence presented before the jury at the trial. Put in oversimplified terms, the myelogram is a medical diagnostic technique used to search for and locate abnormal encroachments upon the spinal cord. A pantopaque oil or dye is injected into the spinal canal and run under fluoroscopic control throughout the spinal canal. The patient is placed upon a table which permits lowering of his head so that the oil will flow from the base of the canal toward the head by gravity. There was evidence to support the proposition that taking of X-ray films of the dye is an integral part of myelography. The view of the dye afforded by fluoroscopic means is not as detailed as that afforded by use of X ray. Additionally, the varying angles available through use of X ray of the dye afford more accurate revelation of the condition of the spinal canal than is obtained from the fluoroscopic scanning and the single-angle, spot-film X rays which

may be made while the fluoroscopic examination is in progress. No X-ray film was made of the oil during the course of the myelographic examination of the appellant performed by the appellees. It is proper to state, although the point is not reached in this decision, that the appellees explained their omission of X rays on account of appellant's embarrassed breathing, which caused appellees to conclude that an immediate tracheotomy must be performed so that there was no opportunity for making X rays.

Appellant's condition is described as paraplegic, which means paralysis of the lower half of the body on both sides. The medical evidence in the record is unanimous that his condition is now permanent and incurable within the present knowledge of medical science.

In July 1965, appellant consulted Dr. John S. Collis, Jr., a neurosurgeon in Cleveland, Ohio. Dr. Collis did a myelogram examination of the appellant, making X-ray pictures of the dye in addition to the fluoroscopic inspection. No abnormality of the spinal canal was detected by Dr. Collis from the fluoroscopic inspection, but an examination of the X-ray films disclosed to Dr. Collis a herniated, intervertebral disc in the C 6–7 space. Dr. Collis performed surgery and removed the disc, but no improvement in appellant's condition resulted. Dr. Collis testified that he had had little or no hope that the removal of the disc as late as July 1965 could produce a beneficial result for appellant's paralysis, but he believed that even the remote chance was worth taking. This brings into focus the critical issue at bar.

It is the contention and theory of the appellant that the appellees were guilty of negligence in failing to obtain X-ray pictures of the dye in appellant's spinal canal when the myelogram was performed on January 24, 1965. It is urged that had such films been obtained the presence of the herniated disc would have been discovered, and immediate removal of the disc could and would have relieved the paraly-

sis. We may assume, without deciding, that the appellant presented sufficient evidence to create a submissible issue as to negligence in failing to obtain the X-ray pictures. The stubborn question of proximate cause is immediately confronted. The only medical testimony supporting appellant's position as to proximate cause was given by Dr. Collis. In view of the extreme significance of Dr. Collis' evidence in this respect, we quote pertinent portions of it. There was a long hypothetical question concluding in this language:

"* * * [Dr. Collis,] in your opinion if the same operation which you performed upon the plaintiff, Robert Walden, had been performed upon this patient within one to two days of the onset of the paralysis at 3:00 a.m. on January 24, 1965, can you state with reasonable medical certainty whether or not the patient could recover?

A. Yes, he could."

When asked to explain the basis of that opinion, Dr. Collis gave a lengthy answer including the following statements:

"I doubt that this patient would have recovered even if he had this operation immediately. Nonetheless, he would have a chance, he could have recovered."

Other excerpts from Dr. Collis' evidence include:

"Q. Is it your medical opinion that this patient would have had only a possibility of recovery?

A. That's correct.

Q. Is it also your medical opinion, assuming those facts and assuming an operative procedure had been performed at about 6:00 o'clock P.M. on the evening of January 24, 1965, to remove the assumed disc, that this patient would probably not have recovered?

A. That's correct."

It is the view of a majority of the court that the evidence in behalf of appellant

fails to establish a submissible jury issue on the matter of proximate cause. In 13 A.L.R.2d 11, et seq., appears an annotation entitled "Proximate Cause in Malpractice Actions." It is said at 13 A.L.R.2d 22:

· "The courts are agreed that proof of causation must go beyond a showing of a possibility that the injuries arose from the defendant's negligence or lack of skill, since the jury will not be permitted to speculate as to the causes of the injury."

In 41 Am.Jur., Physicians and Surgeons, Section 131, page 244, it is written:

"The fact, however, that a physician may have been negligent is not sufficient to render him liable, and the complaining patient must prove that the injury complained of proximately resulted from such want of care or skill. A bare possibility of such result is not sufficient. That the negligence of a physician was the proximate cause of injury to his patient need not be established with certainty, but probability is sufficient."

In Jarboe v. Harting, Ky., 397 S.W.2d 775, at page 778, this court said:

"There may, of course, be situations in which causation is so apparent that laymen with a general knowledge would have no difficulty in recognizing it. See Johnson v. Vaughn, Ky., 370 S.W.2d 591; Annotation, 13 A.L.R.2d 11 at page 34. But excepting those situations we have adhered to the rule that the causal connection between an accident and an injury must be shown by medical testimony and the testimony must be that the causation is probable and not merely possible. See Kelly Contracting Company v. Robinson, Ky., 377 S.W.2d 892."

See also the authorities cited in Jarboe v. Harting, supra, supporting the views expressed there.

The appellant has called to our attention numerous decisions of this and other courts which he considers sufficient to support his contention that a submissible jury issue is presented in the evidence. We shall briefly review the authorities relied upon by the appellant.

Burk v. Foster, 114 Ky. 20, 69 S.W. 1096, 59 L.R.A. 277, was handed down in 1902 and involved the plaintiff's claim that the defendant doctor failed to discover the dislocation of the head of the humerus from the glenoid cavity. It was further charged that the failure to properly diagnose the trouble resulted in failure to treat it properly, so that the muscles atrophied, the shoulder joint became stiffened, and plaintiff's arm was rendered practically useless. The evidence showed that when the true condition was subsequently discovered it was too late to effect the cure. In reversing a judgment on the verdict for the defendant, this court condemned the third instruction which had been given, because that instruction precluded recovery "if the result is as good as is usually obtained with like cases similarly situated." In elaborating the basis for its decision, the court said in part:

"We think, when a physician undertakes to give his attention, care, and skill to a given case of injury or disease, the patient is entitled to the chance for the better results that are supposed to come from such treatment, and as are recorded by the science of his profession to a proper treatment. That the patient might have died in spite of the treatment, or that 'ordinarily' they did die in such cases (as formerly in cases of cholera, smallpox, etc.), is no excuse to the physician who neglects to give his patient the benefit of the chance involved in a proper treatment of his case. That no treatment would avail, or that ordinarily careful treatment would not, might be shown, if the case so warranted. In this case the patient was entitled to an ordinarily careful and thorough examination of his injuries, such as the circumstances attending their infliction, the condition of the patient, and the surgeon's opportunities for proper examination suggested and allowed. If the dislo-

cation was discoverable by such examination, and if the physician felt that because of lack of appliances or lack of experience he was unable to treat any peculiar feature of the injury, it was at least the right of the injured man to be apprised of his condition, that he might call in more skilled attention if he desired." Id. 69 S.W. at 1098.

Some of the quoted language, when considered out of context of the factual background, lends support to appellant's position. However, it must be recalled that the decision in Burk v. Foster, supra, was rendered during the reign of the "Scintilla Rule" which was abrogated in Nugent v. Nugent's Ex'r, 281 Ky. 263, 135 S.W.2d 877, decided in 1940. In any event the quoted language from the opinion of Burk v. Foster, considered in the light of the factual background of that case, was based upon conflict in the evidence as to the manner of treatment that should have been given. We do not interpret Burk v. Foster as sustaining the argument that *any* chance of recovery, no matter how remote, entitles the plaintiff in a malpractice suit to have the issue of proximate cause submitted to the jury.

In Johnson v. Vaughn, Ky., 370 S.W.2d 591, it was recognized that in some cases circumstantial evidence may be sufficient to prove reasonable probability or proximate cause in a malpractice action. There, the patient had a perforated trachea. There was evidence that such a condition is not necessarily fatal and sufficient to permit the jury to find that with proper treatment and attention the patient might reasonably have recovered.

In Hicks v. United States (4 Cir.), 368 F.2d 626, there was probative proof in behalf of the plaintiff that a proper diagnosis would have enabled treatment affording a real opportunity for recovery.

Rogers v. Kee, 171 Mich. 551, 137 N.W. 260, was a case in which the doctor failed to diagnose a fracture and presented the defense that even if diagnosis had been made no satisfactory treatment could have been given. The Michigan court said in its opinion: "We think, however, there is testimony from which injury to some extent might be inferred from the treatment given." Id. 137 N.W. at 263. Again, in the course of the opinion the Michigan court wrote in summarizing medical evidence:

"Such testimony imports clearly that a patient suffering from such an injury on calling a physician is entitled to approved methods of treatment from which experience of the profession indicates beneficial results are probable and to be anticipated; and, if not an entire recovery, a better ultimate condition than if left to chance." Id. 137 N.W. 265.

Throughout the opinion in Rogers v. Kee, supra, the theme of reasonable probability of a better result by treatment is present.

In Bourgeouis v. Dade County, Fla., 99 So.2d 575, 72 A.L.R. 391, relied on by appellant, the plaintiff's decedent was found by police about 1:50 a. m. dressed only in trunks, stretched out on a lawn in a condition which the police officer described as "unconscious." A "relatively superficial clinical examination" was made by an intern at the hospital to which the plaintiff's decedent had been taken by the police. No X ray was made. The decedent was transferred from the hospital to the jail in a patrol car at about 3 a. m. A police officer testified that decedent slumped over the seat of the automobile as if his back were broken, and when he transferred him to the elevator in the jail, the decedent could not stand but slumped to the floor. Decedent was placed in a cell on a metal cot and left to himself. At 7 a. m. he was found dead in his cell; death had been caused by air and hemorrhaging in the thoracic cavity resulting from the piercing of the cavity by broken ribs. The Florida court reversed a judgment based on a directed verdict for the defendant in which it treated the proximate cause question in this language:

"As to the existence of a causal relationship between the alleged negligence and

the ultimate death, the opinion of the experts was such that under the circumstances the treatment that this man received at least could have aggravated his condition and expedited his death if the jury believed them." Id. 99 So.2d at 578.

It is seen that in Bourgeouis there was evidence from medical sources presenting a basis for reasonable probability of Bourgeouis' recovery despite his injuries.

Appellant invites attention to Neal v. Welker, Ky., 426 S.W.2d 476, in which we said:

"We may concede that appellant would have had a case warranting a trial if the availability of any medical testimony had been shown to support the contention that Neal had a chance—and that the chance had been obliterated by inadequate treatment by any of the appellee-defendants." Id. 426 S.W.2d 478.

However, in Neal we affirmed a summary judgment for the defendants on the basis that the record showed that Neal's injury was so grave as to preclude any hope that his life could be saved by medical science. The just quoted excerpt from the Neal opinion was made in response to the theory presented by the appellant and may not be taken as authority for the proposition that *any* obliterated chance for recovery, however remote, automatically establishes proximate cause.

We have also considered Shell v. Town of Evarts, 296 Ky. 602, 178 S.W.2d 32; Louisville & N. R. Co. v. Daugherty, 108 S.W. 336, 32 Ky.Law.Rep. 1392; Hopkins v. Commonwealth, 117 Ky. 941, 80 S.W. 156, 25 Ky.Law Rep. 2117; Jefferson Standard Life Insurance Company v. Hurt, 254 Ky. 603, 72 S.W.2d 20; Kentucky Cent. Life Insurance Co. v. Jones, 247 Ky. 432, 57 S.W.2d 72; Hoyberg v. Henshe, 153 Mo. 63, 55 S.W. 83; and McCahill v. N. Y. Transp. Co., 201 N.Y. 221, 94 N.E. 616, 48 L.R.A.,N.S., 131, but will not further extend this opinion in seeking to analyze and distinguish them from the case at

bar. We think that none of those decisions can fairly be construed to excuse the plaintiff in a malpractice suit from the necessity of presenting evidence reflecting medical reasonable probability of proximate cause for the claimed adverse result as related to the charge of negligence.

It is to be remembered that a preliminary diagnosis of a tumor had been made by appellees Jones and Blakey and that they planned surgery looking to the removal of the tumor as a means of affording relief from the paralysis. However, there is no evidence of record to suggest that favorable results would have been probable even had a tumor been found and immediately removed. Thus, it may not be said that the preliminary plan for removal of a suspected tumor presents substantial evidence that the appellees or anyone else considered that there existed a reasonably probable medical chance of reversing or ameliorating the paralytic condition.

The appellant contends, alternatively, that even if the trial court correctly directed the verdict as to the claim of compensatory damages it was error not to permit appellant's recovery respecting special damages represented by his outlay for medical and hospital expenses for care and treatment resulting from appellees' negligent failure to diagnose and treat appellant and advise him of his true condition. We are unable to accept the reasoning advanced by appellant for this corollary contention, since the appellant has failed to show by competent proof that any acts of the appellees proximately caused his condition. He may not have recovery of them even assuming negligence on their part.

In view of the conclusions reached, we do not pass upon the separate claim of Dr. Cowherd that he was entitled to a directed verdict on other additional grounds.

The judgment is affirmed.

MONTGOMERY, C. J., and MILLIKEN, OSBORNE, PALMORE, STEINFELD, and WILLIAMS, JJ., concur.

EDWARD P. HILL, J., dissents.

EDWARD P. HILL, Judge (dissenting).

The nice distinction made by this court between possibilities and probabilities as to proximate cause in workmen's compensation cases should not apply in the present case.

If appellees' negligence deprived appellant of the possibility, real or remote, to regain his health, appellees should answer in damages. I think there was a question for the jury; therefore, I respectfully dissent.