RENDERED:  JULY 12, 2024; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-0507-MR

DAVID ADAMS													APPELLANT

v.
APPEAL FROM OLDHAM CIRCUIT COURT
HONORABLE JERRY CROSBY, II, JUDGE
ACTION NO. 19-CI-00177

DR. JAWED NASIM													APPELLEE

OPINION
REVERSING AND REMANDING

** ** ** ** **

BEFORE:  CALDWELL, EASTON, AND TAYLOR, JUDGES.

CALDWELL, JUDGE:  David Adams (Adams) appeals from a summary judgment granted in favor of Dr. Jawed Nasim (Dr. Nasim) on a medical malpractice claim. The circuit court concluded that Nasim was entitled to judgment because Adams could not establish proximate cause at trial.  After our review, we reverse and remand for further proceedings.

# FACTS

On September 8, 2017, Adams was discharged from Norton Brownsboro Hospital. Three days prior, after presenting to the emergency department, he had been admitted with a diagnosis of Community Acquired Pneumonia. During his hospital stay, Adams was treated with two antibiotics and his condition appeared to be improving. Upon his discharge, Adams was prescribed a different antibiotic called Levaquin by Dr. Nasim. Adams took the medication as prescribed. Rather than continued improvement, Adams experienced complications and ailments he would come to attribute to the Levaquin prescription.

Adams filed a medical malpractice suit against Dr. Nasim on March 14, 2019. An Amended Complaint was filed January 10, 2020. Adams' suit alleged Dr. Nasim held himself out to the public as a licensed physician and/or infectious disease specialist and Adams had reasonably relied upon Dr. Nasim's expertise for competent treatment. The complaint further alleged, after being bed-ridden for several months with worsening symptoms, Adams learned he was experiencing an adverse reaction to Levaquin. On March 15, 2018, Adams was informed he had lost 50% of his eyesight, as well as experiencing neuropathy in his legs, hands, and hips, as a result of taking Levaquin. Adams alleged a breach of the standard of care on the part of Dr. Nasim in prescribing Levaquin rather than

an alternate, less dangerous medication.  He also alleged Dr. Nasim failed to inform him of the risks of taking Levaquin − another breach of the standard of care.

Discovery in the case commenced and a pretrial scheduling order was entered on February 16, 2022.  Adams timely filed an expert witness disclosure on April 1, 2022, identifying Dr. Pamela Noel, M.D., M.P.H., as his sole expert witness.  Dr. Noel is a physician who practices in Tampa, Florida, specializing in internal medicine and the treatment of infectious diseases.

Dr. Nasim, by counsel, took Dr. Noel's deposition on May 22, 2022.  During her deposition, Dr. Noel affirmed her opinion, indicated in Adams' expert disclosure, that Dr. Nasim breached the standard of care by not providing sufficient information to Adams on the risks of Levaquin.[1]  Dr. Noel also indicated her opinion that prescribing Levaquin to Adams was, itself, a breach by Dr. Nasim in the standard of care.  Counsel for Dr. Nasim expressed surprise at this standard of care opinion and discussion of its absence from the pre-trial disclosure ensued.  This was followed by inquiry as to whether Dr. Noel held any other opinions not

---

[1] Dr. Nasim asserted to the trial court that Adams' expert witness disclosure focused only on allegations of lack of informed consent and that the scope of Dr. Noel's opinions expressed in the deposition exceeded the scope of opinions identified in the expert witness disclosure.  However, any differences between the scope of her opinions indicated in the expert witness disclosure versus those expressed in her deposition were not a primary focus of either party's appellate briefs.  And neither party substantively argued any issues about informed consent with citations to supporting legal authority in their appellate briefs.

indicated in the disclosure. When asked specifically whether she would testify as to causation, Dr. Noel affirmed she held the opinion Levaquin had caused Adams' optical neuropathy.

After disclosing the causation opinion during her testimony, Dr. Noel was challenged specifically about whether, as an infectious disease specialist, she was qualified to render a causation opinion on a condition within the realm of ophthalmology. Discussion in this manner was extensive and a long series of inquiries on the subject was presented to Dr. Noel. Her response to this line of questioning was, at times, equivocal.

On one occasion, she responded to the inquiry: "Q. Are you going to provide an opinion, within reasonable degree of medical probability, that Levaquin was a substantial factor in causing injury to Mr. Adams? A. Yes." At another juncture: "Q. I think we're going in circles. My question was, are you able to state that Levaquin was a substantial factor in causing his optic neuropathy? A. No." More detailed testimony in Dr. Noel's deposition, prior and subsequent to these two inquires, also occurred, as will be discussed *infra*.

Following the deposition of Dr. Noel, Dr. Nasim disclosed two expert witnesses on August 19, 2022 – a physician with a specialty in internal medicine and infectious disease, as well as a physician who specialized in ophthalmology. Although it appears depositions for these experts were scheduled, they did not

occur. Dr. Nasim moved for Summary Judgment on November 7, 2022. Adams filed a responsive brief and Dr. Nasim followed with a reply brief. Oral arguments on the motion occurred. In response to the circuit court inquiring as to passages of Dr. Noel's deposition referenced by Adams, the entirety of the deposition was tendered to the circuit court.

After reviewing the parties' briefs and Dr. Noel's deposition testimony, the trial court entered a written order granting Dr. Nasim's motion for summary judgment and dismissing Adams' medical malpractice suit. The trial court concluded that, during the deposition testimony of Dr. Noel, she "all but conceded she was not qualified, as an expert witness, to offer an opinion on the required element of causation of Plaintiff's alleged injuries. Therefore, no genuine issue of material fact exists as to the element of causation. As such, Plaintiff's medical negligence claims against Dr. Nasim fails as a matter of law."

Adams filed a motion pursuant to CR[2] 59.05 requesting that the trial court set aside its order granting summary judgment. The trial court denied the motion to set aside the summary judgment. Adams then timely filed this appeal.

---

[2] Kentucky Rules of Civil Procedure.

# ANALYSIS

## Applicable Standards of Review

Adams asserts he is appealing from the denial of his CR 59.05 motion as well as the grant of summary judgment in Dr. Nasim's favor. Some authority indicates that an order denying CR 59.05 relief is not a final and appealable order. *See Ford v. Ford*, 578 S.W.3d 356, 365 (Ky. App. 2019). Assuming denial of CR 59.05 relief is final and appealable, precedent indicates the applicable standard of review is abuse of discretion. *See id*. at 365-66.

In any event, our focus is naturally on the merits of the underlying summary judgment granted since the denial of the CR 59.05 motion did not alter it. *See id.* at 366 (construing purported appeal from an order denying CR 59.05 relief as an appeal from the underlying judgment since the denial of CR 59.05 relief did not alter the underlying judgment).

Reviewing the underlying judgment granting summary judgment, we are to determine "whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law." *Scifres v. Kraft*, 916 S.W.2d 779, 781 (Ky. App. 1996); CR 56.03. In doing so, we apply the non-deferential *de novo* standard of review. *See Adams v. Sietsema*, 533 S.W.3d 172, 177 (Ky. 2017) (granting summary judgment is a legal rather than factual determination subject to *de novo* review). When

ruling on a summary judgment motion, we keep in mind the trial court's obligation to construe the evidence in the light most favorable to the party opposing summary judgment. *See Andrew v. Begley*, 203 S.W.3d 165, 169 (Ky. App. 2006) ("In considering a motion for summary judgment, the court must view all the facts and inferences drawn therefrom in the light most favorable to the party opposing the motion, and all doubts are to be resolved in his or her favor.").

## Expert Testimony About Causation is Generally Required to Prove Medical Malpractice Claims

Kentucky precedent makes clear that expert testimony is generally required to prove medical malpractice. *See Blankenship v. Collier*, 302 S.W.3d 665, 675 (Ky. 2010) ("[A] plaintiff bringing a typical medical malpractice case is required by law to put forth expert testimony to inform the jury of the applicable medical standard of care, any breach of that standard and the resulting injury.").

Expert testimony is typically essential to establish the element of causation in medical negligence particularly:

> "It is beyond dispute that causation is a necessary element of proof in any negligence case." *Baylis v. Lourdes Hosp., Inc.*, 805 S.W.2d 122, 124 (Ky.1991). "[I]n most medical negligence cases, proof of causation requires the testimony of an expert witness because the nature of the inquiry is such that jurors are not competent to draw their own conclusions from the evidence without the aid of such expert testimony." *Id.* (Footnote omitted); *see also Andrew v. Begley*, 203 S.W.3d 165, 170 (Ky. App. 2006). Thus, in order "[t]o survive a motion for summary judgment in a medical malpractice case in

-7-

which a medical expert is required, the plaintiff must produce expert evidence or summary judgment is proper." *Andrew*, 203 S.W.3d at 170.

*Rogers v. Integrity Healthcare Services, Inc.*, 358 S.W.3d 507, 511-12 (Ky. App. 2012) (footnote omitted).

To support a finding of the element of causation expert testimony must be expressed in terms of *reasonable medical probability*:

> Under established Kentucky law, proximate causation is a necessary element of a medical malpractice claim; the complainant must demonstrate that the medical professional's breach of the standard of care was a proximate cause of the complainant's injury. *See Baylis v. Lourdes Hosp., Inc.*, 805 S.W.2d 122, 124 (Ky. 1991) (citations omitted). To be the proximate cause of the injury, the conduct in question must be a substantial factor in causing the injury. *See Bailey v. North American Refractories Co.*, 95 S.W.3d 868, 871 (Ky. App. 2001).

*Ashland Hospital Corporation v. Lewis*, 581 S.W.3d 572, 577 (Ky. 2019).

Expert testimony which satisfies the causation element "must indicate that an alleged negligent act probably caused the injury and that a nexus between the alleged act and the injury is not merely a speculative possibility." *Richmond v. Hunt*, 596 S.W.3d 103, 106 (Ky. App. 2019) (citing *Jarboe v. Harting*, 397 S.W.2d 775 (Ky. 1965); *Jackson v. Ghayoumi*, 419 S.W.3d 40 (Ky. App. 2012); *Brown-Forman Corp. v. Upchurch*, 127 S.W.3d 615 (Ky. 2004); *Turner v. Commonwealth*, 5 S.W.3d 119 (Ky. 1999)). However, precedent also stresses "that

substance should prevail over form and that the total meaning, rather than a word-by-word construction, should be the focus of the inquiry." *Baylis*, 805 S.W.2d at 124 (citing *Walden v. Jones*, 439 S.W.2d 571 (Ky. 1968); *Morris v. Hoffman*, 551 S.W.2d 8 (Ky. App. 1977)).

**The Testimony of Adams' Medical Expert Created a Genuine Issue of Fact as to Causation of Adams' Optical Neuropathy**

Upon reviewing the deposition testimony of Dr. Noel, Adams' medical expert, and applying these standards, we cannot agree with the trial court's conclusion Dr. Noel's testimony regarding her qualifications warranted summary judgment.

The trial court described deposition testimony as establishing that Dr. Noel "could not provide expert testimony that Levaquin was a substantial factor in causing [Adams'] vision loss." The trial court quoted the following testimony:

> Q And specifically what injury are you going to tell a
> jury he suffered due to Levaquin?
>
> A So I believe the optic neuropathy that he had because
> Levaquin – one of the adverse reactions potentially is
> neuropathy. So, I believe his optic neuropathy was likely
> – that Levaquin likely attributed to his neuropathy in the
> eye.
>
> Q Did the Levaquin – so was the Levaquin a substantial
> factor in causing the neuropathies in his eyes?
>
> A The best that I can say is that it contributed to it. I
> can't measure that.

Q Why not?

A There is no way that I can quantify it.  What percentage, I just – there is no way I can do that.

Q So you're unable to state that the taking of Levaquin was a substantial factor in causing his optic neuropathies?

A So it's just based on a timeline.  I don't have any records of him having visual loss from neuropathy prior to him taking the Levaquin.  And so, because his symptoms when he presented to the ophthalmologist, he stated that his symptoms started his Visual loss started when he after he had completed the course of his Levaquin and so I don't have any other basis to believe that he already had Significant neuropathy causing visual loss prior to taking Levaquin.

Q I think we're going in circles.  My question was:  Are you able to state that Levaquin was a substantial factor in causing his optic neuropathy?

A No.

However, elsewhere in her deposition, Dr. Noel responded affirmatively to questions regarding whether Levaquin was a substantial factor in causing optical neuropathy to Adams.

The other section of Dr. Noel's testimony highlighted by the trial court was, again, responsive to a series of questions challenging whether, as an infectious disease specialist, she was qualified to opine on causation of optical neuropathy.  The trial court described that Dr. Noel "noted as she was not an ophthalmologist, she stated she did not know how to answer that question."

-10-

However, the testimony which immediately followed offered explanation of why Dr. Noel found counsel's questioning difficult to answer. Dr. Noel additionally affirmed having the opinion Levaquin *was* a substantial factor in causing Adams' optical neuropathy. Within this same testimony, there is also contained an argument her expertise and experience in the matter of antibiotic treatment, as an infectious disease specialist, *did* qualify her to testify on the matter of causation:

> Q. Within the course of your specialty whether you're going to come to Louisville Kentucky to provide an opinion that the taking of Levaquin was a substantial factor in causing an injury to Mr. Adams?
>
> A. Yeah. The reason why I struggle with that question was because I deal with antibiotics obviously every day of my life, right? So, when an antibiotic causes adverse reaction, because I manage patients with antibiotics, I think I have the expertise to provide an opinion as to whether or not that antibiotic caused that injury.
>
> Now, if for example he had an antibiotic that caused him to have an arrhythmia and that antibiotic is known to do that, but I'm not a cardiologist, but he's on an antibiotic that can do that do you see what I'm saying? So, to say that I'm not qualified to say that Levaquin caused an injury that I know can be a potential adverse reaction to that antibiotic, even if I'm not a cardiologist this antibiotic causes arrhythmia, I think I can say that as an infectious disease physician who manages patients with antibiotics.

This testimony showed Dr. Noel was, at times, resolute as to her infectious disease specialty being adequate to qualify her to testify regarding Adams' optical neuropathy:

And so, in this case I think I can be confident in saying that his taking Levaquin did cause potential harm to him even though the harm wasn't an infection because I'm an infectious disease physician. So that's why I'm struggling with that question because I think I can provide an opinion that Levaquin did cause him harm.

Q Are you going to provide an opinion within a reasonable degree of medical probability that Levaquin was a substantial factor in causing injury to Mr. Adams?

A Yes.

Q Tell us what ophthalmology training you have had.

A I have not had any ophthalmology training.

Reviewing the deposition as a whole, despite some equivocations, Dr. Noel *did* consistently confirm she held the professional opinion that taking Levaquin *probably* caused Adams' optical neuropathy. She opined "that Levaquin likely attributed to his neuropathy in the eye." This affirmation continued through the course of the deposition. Answering the inquiry "[a]nd more specifically what injury to his eyes do you claim the Levaquin caused?" She answered: "I believe his worsening visual changes came from the optic neuropathy."

In fact, it appears essentially undisputed that Dr. Noel, in her deposition, expressed her professional opinion that Levaquin was, more likely than not, the cause of Adams' optical neuropathy. Dr. Nasim appears to have acknowledged as much when moving the circuit court for summary judgment. He instead argued:

-12-

Dr. Noel is qualified to provide opinions regarding the standard of care as it pertains to the care and treatment of infectious diseases. She is not qualified to offer an opinion regarding the causation of Plaintiff's alleged eye injury (*i.e.*, "he had lost 50% of his eyesight."). For Plaintiff to prove a claim of medical negligence against Dr. Nasim, Plaintiff must provide expert testimony from a qualified expert who will opine that the Levaquin Dr. Nasim prescribed to Plaintiff caused Plaintiff's alleged vision loss. Plaintiff has failed to provide the required causation opinion from any qualified expert.

This is not a case where Dr. Noel declined to express any opinion regarding causation. Neither is it a case where she conceded her causation opinion indicated mere possibility, rather than probability. Read in context, the occasions Dr. Noel was equivocal on the subject appear to be an acknowledgment that ophthalmology is not her specialty. Her testimony acknowledging a lack of training in the specialty of ophthalmology was the basis of Dr. Nasim's motion for summary judgment and was cited in support of the trial court's order granting same.

Adams argues Dr. Noel's testimony was adequate on the element of causation to create a question of fact for the jury. In support, he cites to *Richmond v. Hunt*, 596 S.W.3d 103 (Ky. App. 2019). *Richmond* was a medical malpractice action, arguing a physician's failure to timely diagnose a blood clot resulted in amputation of the plaintiff's hand. *Id.* During a deposition, plaintiff's retained expert offered equivocal testimony on the issue of causation. *Id.* at 106-07. The

expert initially testified that diagnosis of the blood clot within the "first 48 to 72 hours" was critical to have saved the plaintiff's limb. *Id*. at 106. However, he later "indicated that chances to save fingers after the 72-hour window did not diminish significantly." *Id*. This testimony culminated in the expert appearing to concede he was unable to offer a sufficient opinion regarding causation:

> Q: More probably – more probably than not, you cannot say that had Dr. Murdock seen this patient, that he – that Mr. Richmond would have had any different of an outcome can you?
>
> A: Well, that you can't say, right, because even if – even if he had got the diagnosis correct and you sent him right – he – it might have been too late for his hand, it was very possibly it was too late for his hand already.
>
> Q: You can't say more probably than not that it would have saved the limb?
>
> A: That's right. You can't because . . . until you open up that arm, you really don't know. You really don't know how much damage there is going to be.

*Id*. at 107.

The physician defendant moved for summary judgment, arguing plaintiff's expert could state only that plaintiff *might* have had a different outcome had he been properly diagnosed. The trial court granted summary judgment. This Court found that, while the expert's testimony emphasized by the defendant was equivocal on the issue of causation, in the same deposition, the expert "also testified **that if Richmond had received a correct diagnosis** by December 27,

-14-

there was a **probability** that his injury would have been less severe[.]" *Id*. at 108. (emphasis in original).

Dr. Nasim cites to *Ashland Hospital Corporation v. Lewis* as analogous to the present facts. 581 S.W.3d 572 (Ky. 2019). In *Ashland Hospital*, the plaintiff filed a medical malpractice action, alleging his physician's failure to diagnose a stroke following an angiogram caused greater injury than the stroke would have with earlier intervention. *Id*. at 575-76. However, while the plaintiff's expert alleged a violation of the standard of care by the treating physician, he apparently offered no opinion whatever the treating physician could have limited the effects of the stroke through earlier intervention. The expert, when asked about this specifically, responded it was "impossible to tell." *Id*. at 575.

The testimony the plaintiff in *Ashland Hospital* relied upon for causation came from the deposition of a retained expert for the defense. There, plaintiff's counsel solicited testimony conceding, as a general matter, it was important to treat strokes promptly. However, our Supreme Court found this was inadequate to support causation. In affirming the trial court's grant of summary judgment, the Supreme Court found that "an expert cannot speculate based on general, simplified information regarding diagnosis and treatment." *Id*. at 580. Also, "when the expert witnesses were asked to consider the specifics of this case, they were unable to state with a reasonable degree of medical probability that the

conduct [of the defendants] was a substantial factor in causing [plaintiff's] injuries." *Id.*

While Dr. Nasim contends *Ashland Hospital* is analogous to the present matter, we find it is distinguishable. The issue there was not whether the expert's testimony on causation failed for being contradictory or equivocal; it appears undisputed the plaintiff's expert failed to offer any opinion as to causation. *Id.* at 575. In *Ashland Hospital*, our Supreme Court held the general statements regarding the timely treatment of strokes, which appeared on the record through testimony of a defense expert, failed to create an issue of causation because it offered no analysis under the specific facts and circumstances of the case at hand. *Id.* at 580. In this case, Dr. Noel's testimony did offer an analysis applying specific facts and circumstances of the case.

We find the present matter more analogous to *Richmond* than *Ashland Hospital*. As with the expert in *Richmond*, Dr. Noel's testimony might fairly be described as equivocal. Additionally shared with *Richmond*, there are contrasting sections of the deposition from which the two parties pick and choose for emphasis.

A striking contrast with *Richmond* is present as to the substance of the equivocal expert testimony at issue. In *Richmond*, the defense alleged the equivocal testimony was fatal to the plaintiff's case as it "failed to establish **any**

**causal nexus** between any alleged deviation from the standard of care and Mr. Richmond's injuries." 596 S.W.3d at 107. In the present case, the equivocal testimony at issue went to Dr. Noel's qualifications, specifically a lack of training in the specialty of ophthalmology.

In Kentucky, an expert witness physician is not confined to expressing opinions only within her specialty. "There are numerous reported cases where a physician has been held qualified to express an opinion on medical matters outside his area of expertise." *Owensboro Mercy Health Sys. v. Payne*, 24 S.W.3d 675, 677-78 (Ky. App. 1999). "[T]he lack of specialized training by a doctor goes only to weight and not to competency." *Arndale v. Peay*, 411 S.W.2d 473 (Ky. 1967) (citing *Kabai v. Majestic Collieries Co.*, 170 S.W.2d 357 (Ky. 1943)); *see also Washington v. Goodman*, 830 S.W.2d 398, 400 (Ky. App. 1992); *Ingersoll-Rand Co. v. Rice*, 775 S.W.2d 924 (Ky. App. 1988 ).[3]

In order for an expert to qualify to render opinion evidence, it is clear the witness is not required to prove they possess qualifications of the highest or most particularized sort. There is no indication the circuit court held Dr. Noel was incompetent to offer expert testimony under KRE[4] 702. There is nothing atypical

---

[3] Recently, in a case with a pending motion for discretionary review, another panel of this Court reached a similar conclusion, holding an expert physician need not specialize in the same area of care as the defendant. *Lloyd v. Norton Hospitals, Inc.*, No. 2023-CA-0748-MR, 2024 WL 1685440, at *5 (Ky. App. Apr. 19, 2024) (designated for publication, motion for discretionary review pending).

[4] Kentucky Rules of Evidence.

about a physician rendering an opinion on medical matters outside his area of specialized expertise in Kentucky. *Payne*, 24 S.W.3d at 678-79 (citing *Kabai v. Majestic Collieries Co*., 170 S.W.2d 357 (Ky. App. 1943); *Thompson v. Mayflower Coal Co*., 379 S.W.2d 459 (Ky. 1964); *Rogers v. Sullivan*, 410 S.W.2d 624 (Ky. 1966)). Being a specialist in infectious disease, it could be that Dr. Noel's testimony on the subject of optical neuropathy will not carry as much weight with a jury. *See Payne*, 24 S.W.3d 677-78. However, Dr. Noel's concessions regarding her lack of ophthalmology training did not render her opinions regarding causation so speculative as to disqualify them.

Here, the trial court based its summary judgment on a determination that Dr. Noel had conceded she was unqualified to testify in the field of ophthalmology. However, Dr. Noel's qualifications, as a physician practicing in a different specialty, were a matter appropriate to be weighed by the jury. Accordingly, a genuine issue of material fact for the jury to review was present. *See Goodman*, 830 S.W.2d at 400. Thus, we reverse the summary judgment.

## CONCLUSION

For the foregoing reasons, we REVERSE the trial court's grant of summary judgment and REMAND for further proceedings.

ALL CONCUR.

-18-

BRIEFS FOR APPELLANT:

Michael P. Reilly
Louisville, Kentucky

BRIEF FOR APPELLEE:

Robert L. Whitmer
Craig L. Johnson
Louisville, Kentucky