**James NEAL, Administrator of the Estate of Harry L. Neal, Appellant,**

v.

**George WELKER et al., Appellees.**

Court of Appeals of Kentucky.

March 29, 1968.

Lucien M. Hall, Harold M. Streets, Streets & Hall, Central City, Rhodes Bratcher, Owensboro, for appellant.

Leonard T. Mitchell, Mitchell & Withers, John L. Dorsey, Dorsey & Sullivan, Henderson, Will Tom Wathen, Wathen & Wesley, Morganfield, for appellees.

DAVIS, Commissioner.

In this malpractice action, the trial court entered summary judgment denying the relief sought in the complaint. This appeal challenges that action of the circuit court.

On July 30, 1965, before noon, Harry L. Neal fell from a pickup truck bed and sustained an injury to his head. He received first aid treatment at nearby Camp Breckinridge Infirmary where a laceration on the occipital region of his head was sutured. He was forthwith transferred to Our Lady of Mercy Hospital in Morganfield, where he arrived about 11 a. m. When Neal was admitted to the hospital, he was examined by appellee Dr. John P. Welborn in the emergency room. The examination by the doctor was primarily a routine one in which he tested the patient's reaction to light in his eyes, tendon reflexes, and noted the relative normalcy of the "vital signs" (respiration, blood pressure, pulse rate, and state of consciousness). X rays of the skull were taken and were negative for fracture, although the X-ray films appear to have been lost before this case was decided.

Dr. Welborn directed that Neal be put to bed and kept under observation; the only medication he prescribed at that time was aspirin. Dr. Welborn had a previous commitment to leave Morganfield at noon on July 30 and referred Neal's case to his

partner, appellee Dr. George Welker. In a deposition, Dr. Welker testified that he observed Neal on four occasions between 1 p.m. and 10 p.m. on July 30 and that on all of these occasions he "was holding his own" in that his "vital signs" were normal. There is dispute as to whether Dr. Welker did visit Neal as often as he said he did, and there is question as to whether Neal's "vital signs" remained constant during the period between 1 and 10 p.m. on July 30. Neal's mother and wife arrived at the hospital about 1 p.m. and, according to affidavits in behalf of the appellant, one or the other of them was in the patient's room at all times, and no doctor attended Neal at any time while they were there. The hospital record reflects that during the night of July 30–31 Neal became substantially worse insofar as his state of consciousness and voluntary control of his bodily functions were concerned. He received paraldehyde and more aspirin (the latter of which was administered rectally due to Neal's inability to swallow normally).

By the morning of July 31, Neal's condition had worsened to the extent that his father and other members of his family concluded to remove him to Owensboro for observation and treatment by a neurosurgeon. Neal's father had telephoned to his own family physician who had advised such procedure, according to affidavit for appellant. Dr. William E. Pearson was the neurosurgeon who observed and treated Neal, beginning about 10:30 a.m. on July 31. When Dr. Pearson first saw Neal, an examination disclosed that the patient was very restless, had fixed dilated pupils, was semiconscious, unable to move the four extremities, had a large abrasion of the posterior thorax, and a laceration which had been sutured in the mid-occipital region. Dr. Pearson directed that X rays be taken of the chest, abdomen, and skull. The chest and abdominal X rays were negative, but the skull X rays revealed a large linear fracture from the posterior parietal region running to the left side down to the occi-

put. Dr. Pearson ordered the patient to bed rest and administered cortisone. Neal's condition rapidly deteriorated, and he died at 4:20 p.m. on July 31.

On August 1, an autopsy was performed by Dr. David Orrahood, specialist in pathology, which revealed that the immediate cause of death was respiratory failure of the lungs, secondary to subdural hematoma. Dr. Orrahood made it plain that the failure of the respiratory system resulted from the injury and damage to Neal's brain which he found upon the autopsy. Dr. Orrahood said that he found a massive subdural hematoma in the right frontal lobe and a lesser subdural hematoma in the left frontal lobe. In each of the lobes, he discovered brain damage "with softening and hemorrhage." Dr. Orrahood said that the right cerebral artery "was also involved in the process." The autopsy revealed hemorrhage and softening of the base of the anterior temporal lobe on the left side, plus involvement of the hippocampus gyrus on the left side. Dr. Orrahood said that the autopsy disclosed that Neal's brain was swollen, warranting a diagnosis of cerebral edema. He explained that a subdural hematoma is a bleeding between the brain and its membranous covering, pointing out that the covering of the brain is spoken of as the dura. The most significant portion of Dr. Orrahood's evidence is contained in an answer which we quote: "In my opinion based upon medical certainty this is an extensive and advanced type of brain defect which would lead to death and is irreversible or irretrievable." The just quoted answer was given in response to a question as to whether anything could have reasonably been done to have saved the life of Harry Neal.

Dr. Pearson, the neurosurgeon who attended Neal from the time of his arrival at the Owensboro hospital until his death, testified that in his opinion there was no time from the instant of the accident until the patient's death at which any surgery looking toward relief of his condition was warranted or indicated. He further related

that after examining the hospital records of the patient at Morganfield he saw nothing in the course of treatment afforded Neal which he would have changed or done differently. A most significant answer of Dr. Pearson's is quoted: "I don't think there is anything that anyone could have done to reduce the brain swelling or reduce the damage that the patient sustained to both frontal lobes and the tips of both temporal lobes. I feel there was nothing that could be done in this patient's condition. I feel he was dead when he hit the pavement, at the time of the accident when he fell from the truck." Dr. Pearson expressed the view that the administration of paraldehyde was proper. It is appropriate to observe that Dr. Pearson testified that he did not consider that Neal died of a subdural hematoma but attributed his death to cerebral edema and brain stem compression with probable hemorrhage. He regarded the edema as resulting from the trauma. Dr. Pearson pointed out that medication to reduce edema is available, and was administered by him to Neal, but that its usage is contra-indicated at times because the reduction of edema tends to decrease the intercranial pressure to the extent that bleeding from any present laceration may be expected to resume or increase and thus bring about a larger subdural hematoma. This situation was described by Dr. Orrahood as a "vicious cycle," when he deposed: "The natural sequence of death in this particular case is spoken of as a vicious cycle. Once this cycle is set into effect it is inexorable, and it consists of first the damage, then followed by edema; the edema of the brain causes more damage. More damage causes more edema. These two factors cause destruction. The destruction itself sets up more hemorrhage and bleeding, and a vicious cycle is set into effect which has little influence outside, it being influenced hardly none by outside factors, and leading to death. It is my opinion that the damage from the very beginning was here and increased in the fashion that I have outlined in an unrelenting course."

Dr. Orrahood said that edema could, in some instances, be controlled and reduced, but further said that Neal's was "not the type of case that would have been entered in to reduce the pressure" during the period between the accident and his death.

The appellant made no showing that medical evidence was available to counter the effect of the evidentiary material which we have discussed. It is the appellant's contention that Drs. Welborn and Welker negligently omitted to perform tests upon Neal which would have revealed his critical condition and indicated the urgent need to undertake control of the swelling of the brain. As stated in the brief for appellant, the thesis of appellant's argument is: "We contend that Neal had a chance. This chance was based on immediate diagnosis, and either treatment or transfer to a competent neurosurgeon." We may concede that appellant would have had a case warranting a trial if the availability of any medical testimony had been shown to support the contention that Neal had a chance—and that the chance had been obliterated by inadequate treatment by any of the appellee-defendants. Our difficulty in accepting the argument lies in the fact that there is no showing that such evidence could be presented at a trial. Here the moving party has established the apparent nonexistence of a genuine issue of a material fact. In that circumstance the opposing party (appellant here) is required to "show his hand, or enough of it to defeat the motion, before trial on the merits." Barton v. Gas Service Company, Ky., 423 S.W.2d 902; Robert Simmons Const. Company v. Powers Regulator Co., Ky., 390 S. W.2d 901, 905.

It is recognized by the parties that summary judgment is to be awarded to the moving party "if the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment

as a matter of law." CR 56.03. We have searched the record before us, including the pleadings, depositions, and affidavits and can find no genuine issue of any material fact. There is an issue as to whether Dr. Welker visited the bedside of Neal as often as he said he did, and there is an issue as to whether Dr. Welker neglected to confer with Neal's next of kin, so that they might form an enlightened judgment as to what course to pursue for Neal. None of these issues, however genuine they may be, relates to any material fact. The unrefuted and immutable fact deducible from the record is that Neal's injury was so grave as to preclude any hope that his life could be saved by medical science.

The appellant has called our attention to Hicks v. United States, 4 Cir., 368 F.2d 626 (1966), as authority for the proposition that a defendant's negligent action or inaction effectively terminating a person's chance of survival is actionable, and may not be defended on the premise of conjectures raised as to the extent of the chances of survival. We need neither approve nor disapprove the reasoning of Hicks v. United States, supra, as it is distinguishable from the present case as shown by the face of the opinion. In Hicks appears the following language:

"Both of plaintiff's experts testified categorically that if operated on promptly, Mrs. Greitens would have survived, and this is nowhere contradicted by the government expert." Id. 368 F.2d at 632.

Exactly the converse is true in the case before us. The medical experts testified categorically, and without contradiction, that Neal had no chance and that the fatal progress of his condition was irreversible and irretrievable.

■ Appellant contends that the trial court rendered summary judgment against him for the failure of appellant to respond to an affidavit as to how the accident occurred. We are unable to discern anything in the record that supports such an argument. It is not required that the adverse party file any sort of answer or defensive pleading or other response to a motion for summary judgment, and no such requirement was made of appellant. When the moving party has presented evidence showing that despite the allegations of the pleadings there is no genuine issue of any material fact, it becomes incumbent upon the adverse party to counter that evidentiary showing by some form of evidentiary material reflecting that there is a genuine issue pertaining to a material fact. Tarter v. Arnold, Ky., 343 S.W.2d 377. Of course, it is not proper to weigh the evidentiary material offered by the adverse parties with a view to determining which side is to be believed. It is necessary only to determine whether there is a genuine issue of fact material to the decision of the case. As noted, there is nothing in the present record to indicate any such genuine issue as to a material fact. Cf. Rowland v. Miller's Adm'r, Ky., 307 S.W.2d 3.

Upon his motion to set aside the summary judgment, the appellant filed affidavit asserting "that the plaintiff herein both can and will if granted opportunity, produce competent medical evidence that Harry L. Neal was not treated in a manner accepted by the medical profession; was in fact ignored by Drs. Welker and Welborn who until the autopsy had no idea of the extent or nature of the injury and failed completely to treat him for it." There is no suggestion by the appellant as to the source of any such evidence, nor is there any reason advanced why the alleged evidentiary material had not been presented in some form before submission of the case upon summary judgment. In this state of the record, we must hold that the summary judgment was properly granted. The curtain must fall at some time upon the right of a litigant to make a showing that a genuine issue as to a material fact does exist. If this were not so, there could never be a summary judgment since "hope springs eternal in the human breast." The hope or bare belief, like Mr. Micawber's, that

something will "turn up," cannot be made basis for showing that a genuine issue as to a material fact exists. Conley v. Hall, Ky., 395 S.W.2d 575. There was no request for continuance to obtain additional affidavits as envisioned by CR 56.06.

This opinion has pointedly failed to make reference to any alleged negligence as respects Our Lady of Mercy Hospital. The appellant makes no claim in his brief against the hospital, nor could he, in view of the utter lack of any showing which could support a finding against the hospital, apart from any derivative liability based on negligence of the doctors on its staff. We do not decide here whether any such liability could exist.

The judgment is affirmed.

WILLIAMS, C. J., and HILL, MILLIKEN, MONTGOMERY, OSBORNE, and STEINFELD, JJ., concur.

PALMORE, J., not sitting.