RENDERED: APRIL 22, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-1050-MR

NATIONWIDE AGRIBUSINESS
INSURANCE COMPANY                                                    APPELLANT

APPEAL FROM CUMBERLAND CIRCUIT COURT
v.         HONORABLE DAVID L. WILLIAMS, JUDGE
ACTION NO. 17-CI-00012

BRANDON DAY THOMPSON;
NICOLE VIVETTE THOMPSON;
JEAN THOMPSON; THE BRANDON
DAY THOMPSON AND NICOLE
VIVETTE THOMPSON JOINT
LIVING TRUST; THE THOMPSON
TRUST; EMORY MESSENGER;
KENNETH CLARK; AND THE
UNKNOWN DEFENDANT                                                    APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE: MAZE, TAYLOR, AND K. THOMPSON, JUDGES.

THOMPSON, K., JUDGE: Nationwide Agribusiness Insurance Company

(Nationwide) appeals from the Cumberland Circuit Court's orders granting

summary judgment[1] to Brandon Day Thompson, Nichole Vivette Thompson, Jean

Thompson, the Brandon Day Thompson and Nichole Vivette Thompson Joint

Living Trust (Joint Trust), and the Thompson Trust (collectively the Thompsons),[2]

and granting summary judgment to Emory Messenger, which dismissed the

Thompsons and Messenger from the case. These orders were made final and

appealable. Summary judgment was not sought by Kenneth Clark or the unknown

defendant.[3]

## FACTUAL AND LEGAL BACKGROUND

On July 8, 2015, James and Kylie Fisher purchased a residence on

approximately fifty-eight acres of land in Burkesville, Kentucky, from the

Thompson Trust, of which Jean is a trustee. Jean formerly occupied the residence

---

[1] The circuit court's order was entitled "Partial Summary Judgment" but it in fact granted the Thompsons complete relief and dismissed the complaint against them. The order's title mirrored the title of the Thompsons' motion which sought summary judgment on all claims brought against them but was not seeking summary judgment regarding the other parties. Therefore, to avoid confusion, we simply refer to this order as granting summary judgment and the Thompsons' motion as seeking summary judgment.

[2] The captioned names provided in the notice of appeal appear to be incorrect as to the spelling of "Nicole" based upon circuit court orders, previous court filings and other legal documents contained in the record in which Nicole is spelled "Nichole." Therefore, we use "Nichole" in the body of this Opinion and refer to her as Nichole Thompson. We have also corrected the spelling of Nichole when referring to the Brandon Day Thompson and Nichole Vivette Thompson Joint Living Trust. As "Jean" is used in the circuit court orders and previous court filings while Jeanenne is used in other legal documents, and Jean appears to be a shorted form of Jeanenne, we use "Jean" unless referencing a direct quote.

[3] Service was attempted on Clark by certified mail; Unknown Defendant was served by warning order attorney.

which she had owned for two years. Simultaneously, the Fishers purchased adjoining land that constituted about another fifty-eight acres from the Joint Trust, of which Brandon is the trustee. Jean is Brandon's mother and Brandon has Jean's power of attorney; Brandon and Nichole were also Jean's neighbors, having lived on an adjoining parcel not relevant to this suit.

The conveyance to the Fishers was made through a single deed, for a single purchase price, with the terms set out in a single promissory note. Brandon and Nichole, as trustees of the Joint Trust, and Jean as trustee of the Thompson Trust, were listed as the grantors. The deed referenced two tracts of land, one from the Joint Trust which consisted only of land, and one from the Thompson Trust which contained a house on land. The promissory note references the principal sum of $245,000 as being due to the Thompsons or survivor thereof but provided for separate monthly payment checks being due at the same time to Jean as trustee of the Thompson Trust and Brandon and Nichole as trustees of the Joint Trust.

The Thompsons conveyed the properties only with a General Warranty of Title, warranting that they had a good right and title to sell and convey the properties. The Thompsons did not make any warranties as to the condition of the house. The Thompson Trust paid for an inspection and provided the inspection report to the Fishers prior to the sale.

The house was not mentioned at all in the deed and only mentioned in the portion of the promissory note that provided:

> The Payors shall also be required to maintain insurance on the dwelling house, in an amount of at least $100,000.00, with the Thompson Trust as loss payable in the event of loss. Payors must provide said Payee with a copy of the declaration page of the insurance policy showing said Payee as loss payable.

The Thompson Trust also maintained insurance on the residence through Kentucky Farm Bureau (KFB).

While living in the house, Jean had extensive renovations done, including a complete remodel of the bathroom and kitchen, new flooring, and structural repair. As part of these renovations, Brandon helped Jean arrange for electrical work to be done on the house. Exterior electrical work, which was properly permitted, was performed by Emory Messenger consisting of correcting the 100 amp service being connected to an 200 amp panel box, by updating the service to 200 amp to the existing 200 amp panel box. This work passed inspection.

Interior electrical work took place to rewire two upstairs bedrooms, with the rewiring taking place in the attic space adjoining those bedrooms to address frayed and exposed wiring. The interior electrical work was performed by a neighbor, Clark, who was not an electrician.

On March 12, 2016, approximately nine months after the sale, the home caught fire and suffered significant damage. Nationwide and KFB each made payments for the damage. As to the structural damage, Nationwide and KFB negotiated that KFB would be responsible for 41% of that damage, with the balance to be paid by Nationwide. Nationwide issued a check for $85,251.90 to "Fisher, James and Brandon & Nichole Thompson" for its share of the structural damage. While this check was negotiated, the Thompsons deny that any of them signed it. KFB paid Jean $53,644.65 for its share of the structural damage. Nationwide also paid the Fishers $41,258.63 for contents damage and $15,182.87 for replacement lodging.

A later investigation connected the fire with faulty electrical work in the attic, which consisted of an incorrect connection between new wiring and existing wiring. We assume for purposes of this appeal in reviewing the grant of summary judgment that the cause of the fire was established to be this faulty connection.

In March 2017, Nationwide filed a complaint against the Thompsons, Messenger, and Unknown Defendant. Nationwide made the same two allegations against Brandon and Nichole, the Joint Trust, Jean, and the Thompson Trust: (1) they were negligent in hiring certain individuals to perform electrical work at the residence; and (2) they failed to disclose known defects at the time of the sale of

the residence. Nationwide alleged that it was damaged as a result, based upon having to pay insurance damages. As to Messenger and Unknown Defendant, Nationwide alleged that each had a duty to exercise reasonable care in all aspects of any electrical work at the residence, were negligent in performing such work, and as a result Nationwide was damaged. The Thompsons then filed a third-party complaint against the Fishers.

In June 2018, after deposing Brandon and learning that Clark had performed electrical work inside the residence, Nationwide was permitted to file an amended complaint adding Clark as a defendant in August 2018. Nationwide's allegation against Clark was identical to that against Messenger and Unknown Defendant.

In September 2018, and October 2018, the Thompsons and Messenger filed motions for summary judgment. While they were pending, in November 2018, the Thompsons requested leave to file an amended third-party complaint against the Fishers. They alleged among other things that the Fishers defaulted on the promissory note and committed fraud by negotiating the check from Nationwide for the loss due to the fire after forging Brandon and Nichole's signatures.[4]

---

[4] The record does not reflect that the circuit court took any action on approving the filing of this amended third-party complaint, however, we recite these allegations as they are relevant to the arguments relating to the summary judgment motions and the circuit court's subsequent rulings.

# SUMMARY JUDGMENT

## I.    MESSENGER

In October 2018, Messenger moved for summary judgment on the basis that Nationwide in its tardy answers to interrogatories failed to explain the factual basis behind its claim that Messenger was negligent in performing electrical work and that his negligence was a substantial factor in causing the fire. Messenger stated that because it was established the fire occurred in the attic, he could not be responsible where his only work on the residence was outside the house to install 200 amp service to the existing panel box, he obtained the appropriate permit, his work was inspected and approved, and there was no damage to the panel box from the fire. Messenger denied that the deposition of Brandon showed any basis for his liability because Brandon, who was familiar with the electrical work performed on the residence, denied that Messenger performed any electrical work whatsoever inside the house.

In December 2018, Nationwide filed its response to Messenger's motion for summary judgment. It argued summary judgment was inappropriate because "Mr. Messenger must show that there is undisputed evidence that he did not perform the work and that his relationship to whomever did perform the work was not such that Mr. Messenger could have liability for that person's negligence." Nationwide argued that Messenger's admission he had done some exterior work

did not exonerate him from claims of negligence for interior work and Brandon's testimony provided a possible connection between Clark and Messenger. Nationwide also argued that summary judgment was premature where Jean and Messenger had yet to be deposed and Clark has not yet been served.

In January 2019, the circuit court granted Messenger's motion, noting that during oral argument it had granted Nationwide ten days to produce some affirmative evidence to create a material issue of fact linking any act of Messenger as being a substantial factor in causing the fire, but Nationwide failed to produce any such evidence.

## II.     THE THOMPSONS

In September 2018, the Thompsons moved for summary judgment on several grounds.[5]  The Thompsons filed two different memoranda in support of this motion.

In the September 2018 memorandum, they argued that as to Brandon, Nichole, and the Joint Trust, they had no duty to the Fishers and had not violated any duty based on lacking any ownership interest in the residence.  They further argued there was no evidence to suggest that they hired anyone to perform work on the residence, could not be liable as agents to the Thompson Trust (although the

_____

[5] We only discuss the grounds sought and the resolution by the circuit court that are relevant to this appeal.

Thompson Trust could be liable), *caveat emptor* applied, and there was no evidence of a fraudulent omission.

In the October 2018 memorandum, they argued: (1) the agreement between the Thompsons and the Fishers precludes Nationwide's subrogation claim against any of the parties because the intent of the agreement requiring the Fishers to maintain insurance on the residence was intended to have the Fishers assume the risk of loss, rather than the Thompsons; (2) an insurer cannot assert a subrogation action against its own insured, which included the Thompson Trust where the Fishers were required to name the Thompson Trust as a loss payee on the policy but failed to do so; and (3) the Thompsons have an equitable lien on the policy proceeds to the extent of their insurable interest of $245,000, which Nationwide recognized by issuing a check for damages payable to James Fisher and Brandon and Nichole Thompson, so the Thompsons are effectively insured under the policy.

In November 2018, Nationwide filed its response to the Thompsons' motion for summary judgment and denied that summary judgment in favor of the Thompsons was appropriate. Nationwide argued if subrogation protected the Thompsons, it should only extend to their insurable interest and not include the contents or loss of use costs. Nationwide argued the Fishers' violation of the promissory note cannot relieve the Thompsons of their negligence which they did not contract away through an exculpatory clause by requiring insurance, and their

willful actions could not be excused through an exculpatory clause. Nationwide argued Brandon's actions in allowing Clark to do the rewiring were wanton and in violation of a safety statute, and furthermore the Thompsons' undisclosed actions prior the sale would have resulted in the voiding of the insurance contract had they been the ones entering into it as it voided coverage for defective renovation, was a material misrepresentation, and under the fortuity doctrine where the damage resulted from intentional acts, it barred coverage.

In February 2019, after hearing argument from counsel, the circuit court granted the Thompsons' motion for summary judgment. It made this ruling on the basis that: (1) the documents associated with the sale of the property showed that the Fishers and the Thompsons intended for the Fishers to assume the risk of loss through the purchase of insurance, thus relieving them of liability; and (2) "Kentucky law does not permit an insurer to maintain a subrogation action against a party to a contract for whom insurance coverage was contracted and for whom it was to benefit." It explained that by Nationwide issuing an insurance check with Brandon and Nichole Thompson listed as payees, it recognized the Thompsons as insureds and it could not subrogate against its own insured.

**MOTIONS TO ALTER, AMEND, OR VACATE**

Nationwide filed motions to alter, amend, or vacate these orders granting summary judgment to Messenger and the Thompsons in February and

-10-

March 2019. As to the grant of summary judgment to Messenger, Nationwide argued Brandon's testimony clearly indicated that "Mr. Messenger and Mr. Clark had some kind of pre-existing relationship which may have been a contractor/subcontractor arrangement[.]" Nationwide asserted that Messenger's proof that he performed exterior work did not preclude his later performing interior work on the residence and Brandon's statement that Messenger did not perform the interior work was subject to doubt. It also pointed to the fact "Mr. Messenger has yet to be deposed or otherwise explain the work he did or his relationship with Mr. Clark, who has himself not been served or subject to written discovery or depositions."

In Nationwide's motion to alter, amend or vacate the grant of summary judgment to the Thompsons, it argued: (1) the bar against subrogation was improperly and prematurely applied in light of the incomplete discovery in this case and subrogation should be applied where there is fraud, bad faith, or evidence the insureds derived some inequitable benefit from the covered loss, given that the Thompsons have yet to fully respond to written discovery and production requests, Messenger has not yet been deposed, and Clark has not been served or subject to any discovery; (2) there are factual issues in regard to the parties' intent in the agreement, exculpatory contracts precluding liability for future negligence are disfavored, and parties cannot contract away liability for

-11-

failure to comply with a duty imposed by a safety statute; (3) any bar to subrogation would only apply to the Thompsons' insurable interest, the residence, so Nationwide may still be able to subrogate against them for the amount paid for the Fishers' loss of contents and loss of use, and as Brandon, Nichole, and the Joint Trust were not obligated to be named as insurance beneficiaries on the promissory note, they are not protected from subrogation. Nationwide further requested that the circuit court rule on all the previous bases it had raised in opposition of summary judgment so that it could avoid the need for a subsequent appeal should the order be reversed on appeal.

In June 2019, the circuit court denied Nationwide's motions to alter, amend, or vacate regarding the Thompsons and Messenger. As to the Thompsons, the circuit court addressed the outstanding issues as follows: (1) discovery resulted in two answered sets of written discovery from the Thompsons, the deposition of Brandon, and no discovery dispute was brought before the circuit court, and the court's conclusion on subrogation would not be altered by any additional facts or discovery; (2) there was no factual dispute about the parties to the agreement's intent, which could be interpreted from the four corners of the agreement and was unambiguous; (3) the Thompsons are afforded the same protection against subrogation regardless of their insurable interest; (4) non-sellers Brandon, Nichole, and the Joint Trust have no potential liability for negligence or duty to disclose any

-12-

defects in the residence because they did not own the residence, furthermore, there was no fraud or fraudulent omission and *caveat emptor* applies; and (5) exculpatory provision cases have no application. As to Messenger, the circuit court summarily denied the motion to amend, alter, or vacate.

## THE APPEAL

## I.  SUMMARY JUDGMENT STANDARD

Pursuant to the Kentucky Rules of Civil Procedure (CR) 56.03, summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

"The standard of review on appeal of a summary judgment is whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law." *Scifres v. Kraft*, 916 S.W.2d 779, 781 (Ky.App. 1996). Summary judgment "should only be used 'to terminate litigation when, as a matter of law, it appears that it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor and against the movant.'" *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 483 (Ky. 1991) (quoting *Paintsville Hospital Co. v. Rose*, 683 S.W.2d 255, 256 (Ky. 1985)).

"A summary judgment is only proper after a party has been given ample opportunity to complete discovery, and then fails to offer controverting evidence." *Pendleton Bros. Vending, Inc. v. Commonwealth Finance and Admin. Cabinet*, 758 S.W.2d 24, 29 (Ky. 1988). Whether a party's opportunity to complete discovery is reasonable will naturally be fact-specific. *See Bowlin Group, LLC v. Rebennack*, 626 S.W.3d 177, 187-88 (Ky.App. 2020); *Suter v. Mazyck*, 226 S.W.3d 837, 844 (Ky.App. 2007).

## II.     THE COMPLETION OF DISCOVERY

Nationwide argues that summary judgment was prematurely granted as to both Messenger and the Thompsons, because Nationwide had not had an opportunity to complete its discovery. We are confident that Nationwide had an ample opportunity to complete discovery and that further discovery would have been pointless.

While Nationwide now vaguely states that discovery had not been completed regarding its claim against Messenger, it has not stated what further discovery it would wish to do. During a hearing on November 29, 2018, the circuit court gave Nationwide one final opportunity to provide proof that Messenger's actions were connected to the fire. The circuit court specified it was giving Nationwide ten days to provide such proof and inquired whether this would be a sufficient time for Nationwide to respond. Nationwide said it was acceptable.

When another hearing was held on January 24, 2019, the circuit court inquired as to whether any further discovery had taken place. Nationwide stated that it had not engaged in any further discovery and did not request any further opportunity to do so.

As Nationwide has failed to assert what discovery it would do regarding its claim against Messenger, and failed to engage in any additional discovery when given the opportunity to do so, we are confident that summary judgment was not prematurely granted to Messenger.

As to the Thompsons, Nationwide argues that the Thompsons failed to respond to its second set of requests for production of documents, so its discovery was incomplete. The documents Nationwide requested were irrelevant to the grounds upon which summary judgment was granted. Nationwide asked for proof of Brandon's power of attorney over Jean, copies of checks or receipts that they received from the Fishers in payment of the promissory note, and documents or evidence supporting the claim that the Fishers made payments by two separate checks each month. Nationwide was seeking to make the other Thompsons joint sellers of the residence to make them have the same liability as Jean as trustee of the Thompson Trust, but as we will later discuss why there is no liability for any of the Thompsons, the lack of such discovery was irrelevant and cannot prejudice Nationwide.

We note that below Nationwide stated that it had not deposed Jean or Messenger, and that Clark had not yet been served. However, Nationwide never noticed depositions for Jean or Messenger, and its claims against Messenger and the Thompsons cannot linger indefinitely when it is unclear whether Clark will ever be served.

## III.   DRAFTING OF ORDERS BY OPPOSING COUNSEL

Nationwide argues we should reverse because the circuit court asked opposing counsel to draft the orders granting summary judgment and denying the motions to alter, amend, or vacate.

There is nothing improper about the circuit court memorializing its decisions through orders primarily drafted by opposing counsel. As explained in *Bingham v. Bingham*, 628 S.W.2d 628, 629 (Ky. 1982), "the delegation of the clerical task of drafting proposed findings of fact and conclusions of law under the proper circumstances does not violate the trial court's responsibility." The Kentucky Supreme Court reiterated this point in *Prater v. Cabinet for Human Resources*, 954 S.W.2d 954, 956 (Ky. 1997), stating "[i]t is not error for the trial court to adopt findings of fact which were merely drafted by someone else." As our Court recently noted, "[t]he Supreme Court has not overruled *Bingham* or *Prater*." *Keith v. Keith*, 556 S.W.3d 10, 14 (Ky.App. 2018).

The videos of the hearings regarding the motions for summary judgment and the motions to alter, amend, or vacate confirm that the circuit court clearly stated what it had decided and what needed to be memorialized by counsel. Nationwide has failed to make a showing that the circuit court did not control the decision-making process which is needed to show error pursuant to *Bingham*, 628 S.W.2d at 629-30. Therefore, there was no error in the circuit court's actions.

## IV. MESSENGER'S SUMMARY JUDGMENT

As to the summary judgment granted to Messenger, Nationwide argues the claims against Messenger are warranted because "the record clearly raises a genuine dispute regarding [Messenger's] work at the home and his relationship with Kenneth Clark." It argues that Messenger admitted performing work at the house, his denial of any interior work is self-serving, and "[p]roof that he did some other exterior work is not evidence that he did not do the interior work in question." Nationwide speculates that "[Messenger] and Mr. Clark may have had some kind of professional relationship when Mr. Clark replaced the interior wiring." Nationwide also argues the circuit court wrongfully placed the burden of proof on Nationwide and, to the extent that Messenger's motion for summary judgment was treated as one for failure to state a claim, notice pleading was sufficient.

We disagree. As the circuit court correctly noted, there was simply no established connection between the work that Messenger did on the exterior of the house and the fire. As Nationwide's counsel admitted during a hearing before the circuit court, Messenger's exterior electrical work *could not* have caused the fire and resulting damage.

Brandon testified during his deposition that Messenger did not do any work inside the house. He testified that the interior work was done by Clark. While Nationwide appears to doubt Brandon's testimony, it has failed to provide any evidence that Messenger did any interior work.

Brandon's deposition testimony provides no evidence of a relationship between Clark and Messenger, other than Clark's recommending Messenger and trying to arrange for Messenger to perform electrical work, with Messenger declining to perform any rewiring within the house.[6] To the extent that Nationwide

---

[6] We disagree with Nationwide that this exchange during Brandon's deposition provides any support for its supposition that Clark may have been working for Messenger, thus making Messenger liable for Clark's defective work:

> Q.    **When you say, "Kenny was trying to negotiate with Mr. Messenger to do it [the electrical work]," can you clarify what you mean by that**?
>
> A.    Yes. Kenny – Kenny suggested that – that Emory Messenger would be a licensed electrician that would be willing to work there, so Emory came out, Jeanenne hired him, he began the work outside, and then wanted to be paid for the work outside, and then did not come back to do the work inside.
>
> . . .

-18-

may have thought there was something to explore in the possible relationship between Messenger and Clark, it should have either propounded additional interrogatory questions on Messenger or deposed him. Nationwide did neither.

Nationwide is incorrect that the circuit court wrongfully shifted the burden to it. As explained in *Henninger v. Brewster*, 357 S.W.3d 920, 929 (Ky.App. 2012):

> When the moving party has presented evidence showing that despite the allegations of the pleadings there is no genuine issue of material fact, *it becomes incumbent upon the adverse party to counter that evidentiary showing by some form of evidentiary material reflecting that there is a genuine issue pertaining to a material fact.*

(quoting *Neal v. Welker*, 426 S.W.2d 476, 478 (Ky. 1968) (emphasis original).

Nationwide was given the opportunity to produce some counter evidence and failed to do so. As was the case in *Henninger*:

> [Nationwide's] argument fails because "[c]onclusory allegations based on suspicion and conjecture" are not sufficient to create an issue of fact to defeat summary

---

Q. . . . **So Kenny just volunteered Emory as someone who could do the work, knowing that you-all wanted it done**?

A. I believe that's how it transpired, yeah.

Q. **Then when Emory would not respond to Kenny, as it was explained to you, did you-all ask Kenny to do the work, or did he volunteer to do the work**?

A. I can't remember. He volunteered to do a lot of things, so I would say he volunteered.

-19-

judgment. [*Harstad v. Whiteman*, 338 S.W.3d 804, 812 (Ky.App. 2011)]; *see also Neal*, 426 S.W.2d at 479-80 (emphasizing the appellant's "hope or bare belief . . . that something will turn up cannot be made basis for showing that a genuine issue as to a material fact exists"); *Benningfield v. Pettit Environmental, Inc.*, 183 S.W.3d 567, 572-73 (Ky.App. 2005) (same); *de Jong* [*v. Leitchfield Deposit Bank*], 254 S.W.3d [817,] 825 [(Ky.App. 2007)].

357 S.W.3d at 929. Under these circumstances, summary judgment was appropriately granted as there were no genuine issues of fact as to the work that Messenger did having any relationship to the fire, and there is nothing to connect the interior work that Clark did to Messenger.

## V. THE THOMPSONS' SUMMARY JUDGMENT

Nationwide makes several arguments about why summary judgment should not have been granted to the Thompsons. Nationwide argues: (1) there was no subrogation bar; (2) *caveat emptor* does not bar its claim for fraud; (3) Brandon and Nichole are liable as Jean's agents; (4) the Fishers did not intend to relieve the Thompsons of any liability in obtaining insurance; and (5) to the extent the Thompsons intended the insurance requirement to protect them from liability, it is an invalid exculpatory clause.

In considering whether summary judgment was properly granted to the Thompsons, we first consider what claims Nationwide can properly pursue against them. A right of subrogation "permits [an insurance company] to be placed

in the position of its insured in order to pursue recovery for the payments [the insurance company] was obligated to pay its insured." *Wine v. Globe American Cas. Co.*, 917 S.W.2d 558, 561 (Ky. 1996). "All subrogation rights are derivative and the insurer only acquires the rights of its insured. A subrogee is substituted in place of its insured; it does not acquire greater rights." *Id.* at 566. Therefore, Nationwide, as the insurer of the Fishers, has only the same rights that the Fishers have to recover against the Thompsons.

The circuit court rejected that Brandon, Nichole, and the Joint Trust could be liable for negligence because as non-sellers they lacked any duty to the Fishers. The circuit court rejected that Brandon, Nichole, and the Joint Trust could be liable for a fraudulent omission because the doctrine of *caveat emptor* applied, there was no evidence of a fraudulent omission and, furthermore, they did not own the residence and therefore had no duty to disclose anything about it. The circuit court did *not* address excluding liability to Jean and the Thompson Trust based on lack of duty.

We choose to focus our discussion on whether any of the Thompsons, including Jean and the Thompson Trust, owed any duty to the Fishers. In doing so, we properly act within our role as a reviewing court for it is well-established that "an appellate court may affirm a lower court's decision on other grounds as long as

the lower court reached the correct result." *Emberton v. GMRI, Inc.*, 299 S.W.3d 565, 576 (Ky. 2009).

### A. NEGLIGENCE

Nationwide's complaint and amended complaint argued that the Thompsons were negligent in hiring certain individuals to perform electrical work at the residence. While this claim could be interpreted as being one for "negligent hiring," it appears that the parties have focused upon this claim as being one for simple negligence. In the interest of addressing this claim completely, we address it in both ways.

"Under Kentucky law, the elements of negligent hiring and retention are: (1) the employer knew or reasonably should have known that an employee was unfit for the job for which he was employed, and (2) the employee's placement or retention at that job created an unreasonable risk of harm to the plaintiff." *Ten Broeck Dupont, Inc. v. Brooks*, 283 S.W.3d 705, 733 (Ky. 2009). "[C]laims of negligent hiring/retention focus on the direct negligence of the employer which permitted an otherwise avoidable circumstance to occur." *Id.* at 734.

The problem for Nationwide is that the Thompson Trust was not a conventional employer of Clark. All of the evidence indicates that Clark was an independent contractor.

> An individual is the agent of another if the principal has the power or responsibility to control the method, manner, and details of the agent's work. If, however, an individual is free to determine how work is done and the principal cares only about the end result, then that individual is an independent contractor.

*Nazar v. Branham*, 291 S.W.3d 599, 606-07 (Ky. 2009) (citations omitted).

According to Brandon's deposition, which was the only evidence as to what Clark's role was, Brandon mostly left Clark alone to do the work in the attic, did not monitor his work, and by looking at what Clark did Brandon would not be able to say whether it was done properly or not unless it wasn't connected because "as far as – as codes and how it's – how it's done, neither of us [Brandon or Jean] would have that expertise." Therefore, we conclude as a matter of law that Clark was acting as an independent contractor.

We have been unable to locate any Kentucky authority which would authorize an action for negligent hiring of an independent contractor. *See Smith v. Kentucky Growers Insurance Co., Inc.*, No. 2001-CA-001624-MR, 2002 WL 35628958, at *2 (Ky.App. Nov. 1, 2002) (unpublished) (stating unequivocally "[w]hile some jurisdictions recognize a claim against employers for negligently hiring an independent contractor, Kentucky has not recognized such a claim.").[7] We do not believe it would be appropriate to authorize such an action in the case of

---

[7] We do not rely on *Smith* as authority but note that it confirms what our own investigation has revealed.

homeowner sellers, who without any expertise themselves, hire individuals to work on their homes.

Alternatively, if Nationwide's claim was to be interpreted as a *respondeat superior* negligence claim, the same problem arises because Clark was operating as an independent contractor rather than as an agent of the Thompson Trust. A principal is "generally is not held liable for the conduct of an independent contractor." *Nazar*, 291 S.W.3d at 606.

Common law negligence "requires proof of (1) a duty owed by the defendant to the plaintiff, (2) breach of that duty, (3) injury to the plaintiff, and (4) legal causation between the defendant's breach and the plaintiff's injury." *Wright v. House of Imports, Inc.*, 381 S.W.3d 209, 213 (Ky. 2012) (citations omitted). We do not believe that the Thompson Trust owed a duty to the Fishers for any negligence from Clark's actions.

Duty, the first element, presents a question of law. *Mullins v. Commonwealth Life Insurance Co.*, 839 S.W.2d 245, 248 (Ky. 1992). "If no duty is owed by the defendant to the plaintiff, there can be no breach thereof, and therefore no actionable negligence." *Ashcraft v. Peoples Liberty Bank & Tr. Co., Inc.*, 724 S.W.2d 228, 229 (Ky.App. 1986). In making our determination as to the existence of a duty, we are faced with questions of both law and policy. *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 89 (Ky. 2003).

It is important to note that whether a duty of care exists is a wholly different and distinct concept from whether a standard of care, typically that of reasonable or ordinary care, is met or satisfied. One is a purely legal question, grounded in social policy, while the other is inherently fact-intensive, grounded in common sense and conduct acceptable to the particular community.

*Shelton v. Kentucky Easter Seals Soc., Inc.*, 413 S.W.3d 901, 913-14 (Ky. 2013) (citations omitted).

However, "proper application of negligence law requires courts to view the facts as they reasonably appeared to the party charged with negligence. We are not at liberty to impose liability based on hindsight." *Mitchell v. Hadl*, 816 S.W.2d 183, 186 (Ky. 1991). "Foreseeable risks are determined in part on what the defendant knew at the time of the alleged negligence." *Pathways, Inc.*, 113 S.W.3d at 90.

"In the context of real estate transactions, it is the general rule that 'where no direct representation is made by the vendor concerning definite facts and the purchaser has sufficient opportunity to observe the condition of the premises, the maxim of caveat emptor is applicable[.]'" *Waldridge v. Homeservices of Kentucky, Inc.*, 384 S.W.3d 165, 171 (Ky.App. 2011) (quoting *Fannon v. Carden*, 240 S.W.2d 101, 103 (Ky. 1951)).

In *Wilson v. Southland Optical Company, Inc.*, 774 S.W.2d 447 (Ky.App. 1988), the purchaser of a building and the tenants brought a negligence

-25-

claim against the sellers of the property on the basis that the contractor who the seller hired to install a new air conditioning unit, and who was not an electrician, was negligent where he installed the new unit to the wiring connecting the old unit to the building's power, resulting in a short and a fire because the wiring to the new unit was insufficient. One of the sellers testified that he assumed the contractor, who was not an electrician but had held various jobs in electrical maintenance, could properly install the unit. *Id.* at 448. The sellers appealed after a trial in which they were found to be jointly and severally liable with the contractor, arguing the doctrine of *caveat emptor* precluded their liability under negligence.

The Court framed the issues as follows: "What is the liability of a vendor of land to his purchaser and the purchaser's tenants for losses resulting from defects in the premises?" *Id.* The Court concluded that *caveat emptor* precluded the claim, explaining that any liability would have to be predicated on the failure to disclose a known dangerous condition under the RESTATEMENT (SECOND) OF TORTS § 353 (1965), but the evidence was insufficient to support such a claim. 774 S.W.2d at 228-49. We will discuss *infra* that section of the RESTATEMENT (SECOND) OF TORTS as it relates to the claim of fraudulent omission.

Our sister courts have recognized that there is or may be an exception for *caveat emptor* for "negligent construction" by a builder/seller of houses. *See*

*Cendant Mobility Financial Corp. v. Asuamah*, 285 Ga. 818, 822, 684 S.E.2d 617, 620-21 (2009) (confirming there may be recovery for negligent construction, "by a homeowner seeking recovery against the builder/seller of the home for latent building construction defects"); *Cochran v. Keeton*, 47 Ala. App. 194, 200, 252 So. 2d 307, 312 (Civ. App. 1970) (noting a possible duty for negligent construction where a builder/seller knew it had installed faulty wiring and had not yet corrected it, but deciding the case on other grounds).

However, our sister courts have rejected there being an exception to *caveat emptor* allowing negligence liability for a non-builder/seller. In *Cendant Mobility Financial Corporation*, 285 Ga. at 822, 684 S.E.2d at 621, the Court refused to extend the exception for a builder/seller to allow liability for a non-builder/seller for a negligent repair which left water damage resulting in mold and affirmed the granting of summary judgment to the non-builder/seller based on lack of duty. Similarly, in *Brennan v. Kunzle*, 37 Kan. App. 2d 365, 390, 154 P.3d 1094, 1111 (2007), *overruled on other grounds by Osterhaus v. Toth*, 291 Kan. 759, 781-82, 249 P.3d 888, 903 (2011), the Court concluded that summary judgment was properly granted on a negligence claim to non-builder/sellers of a house (who had no expertise in the design, construction, or repair of homes and were not in the business of construction or selling of homes) regarding ongoing water infiltration issues because they did not construct the house and while they

had repairs made to the house, these were done through independent contractors who apparently made improper or insufficient repairs.

Given the foregoing authority from our Courts and our sister courts, we conclude that as a matter of law, Nationwide could not establish that the Thompsons had any duty to protect the Fishers from the results of any negligence in Clark's rewiring of the bedrooms. Additionally, had there been a duty, no breach of that duty occurred given the facts known at the time the rewiring took place. It is inappropriate to look backward and infer duty and breach of that duty on the part of the Thompsons from the fact that the fire took place.

### B. FRAUDULENT OMISSION

While Nationwide has bandied about the terms fraud, fraudulent misrepresentation, and fraudulent omission, its complaint and amended complaint only raised a claim for fraudulent omission and the circuit court only addressed this claim on that basis.

As explained in *Giddings & Lewis, Inc. v. Industrial Risk Insurers*, 348 S.W.3d 729, 747 (Ky. 2011):

> [A] fraud by omission claim is grounded in a duty to disclose. To prevail, a plaintiff must prove: (1) the defendant had a duty to disclose the material fact at issue; (2) the defendant failed to disclose the fact; (3) the defendant's failure to disclose the material fact induced the plaintiff to act; and (4) the plaintiff suffered actual damages as a consequence. The existence of a duty to disclose is a matter of law for the court.

-28-

(Citations and parenthetical omitted.)

Under Kentucky law, a duty to disclose may arise under the four

following circumstances:

> (1) "from a confidential or fiduciary relationship," (2)
> where "provided by statute," (3) "when a defendant has
> partially disclosed material facts to the plaintiff but
> created the impression of full disclosure," and (4) "where
> one party to a contract has superior knowledge and is
> relied upon to disclose the same."

*Helm v. Ratterman*, 778 Fed. App'x 359, 374 (6th Cir. 2019) (quoting *Giddings &*

*Lewis, Inc.*, 348 S.W.3d at 747-48).  Grounds three and four would be the basis for

a possible duty here.

> Regarding incomplete disclosure:
>
> Since the beginning of our jurisprudence, the principle
> has been consistently adhered to that the concealment by
> a seller of a material defect in property being sold, or the
> suppression by him of the true conditions respecting the
> property, so as to withhold from the buyer information he
> is entitled to, violates good faith and constitutes
> deception which may relieve the buyer from an
> obligation or may permit him to maintain an action for
> damages or to vacate the transaction.

*Hall v. Carter*, 324 S.W.2d 410, 412 (Ky. 1959).  "The voluntary doing of an act

which necessarily results in injury to another, where the party knows the facts and

had reason to know that the injury will result, will sustain an action for fraud."

*Weikel v. Sterns*, 142 Ky. 513, 134 S.W. 908, 909 (1911).

-29-

*Caveat emptor* "does not exonerate the seller from liability for common law fraud." *Waldridge*, 384 S.W.3d at 171.

> In the sale of real estate the intentional suppression of facts known to the seller and unknown to the purchaser is ground for an action for deceit if the purchaser was damaged by reason of the fraudulent concealment. Where there is a latent defect known to the seller and he remains silent with the knowledge that the buyer is acting on the assumption that no defect exists, the buyer has a cause of action against the seller for an intentional omission to disclose such latent defect. However, mere silence does not constitute fraud where it relates to facts open to common observation or discoverable by the exercise of ordinary diligence, or where means of information are as accessible to one party as to the other.

*Bryant v. Troutman*, 287 S.W.2d 918, 920-21 (Ky. 1956) (citations omitted). *See Waldridge*, 384 S.W.3d at 173-74 ("hold[ing] that a seller's real estate agent owes a duty to a buyer to not commit fraud by either misrepresenting a material fact or failing to disclose a material fact of which they have actual knowledge and of which the buyer is unaware[,]" thus subjecting them to potential liability for "common law fraud."); 6A AMERICAN LAW OF TORTS § 18:206 *Houses; generally* (footnotes omitted) (emphasis added) (noting "[t]he ordinary seller or vendor or grantor of an existing and 'used' or 'secondhand' house or similar structure is usually held not liable [for defects in the house]" unless the "vendor fails to disclose a dangerous condition *known to the vendor* where he or she also should

have realized that the vendee did not know about and probably would not discover it.").

Similarly, this tracks with relevant sections of the RESTATEMENT (SECOND) OF TORTS, as discussed in *Wilson*, 774 S.W.2d at 449, regarding the failure to disclose dangerous conditions:

> § 352. DANGEROUS CONDITIONS EXISTING AT TIME VENDOR TRANSFERS POSSESSION
>
> Except as stated in § 353, a vendor of land is not subject to liability for physical harm caused to his vendee or others while upon the land after the vendee has taken possession by any dangerous condition, whether natural or artificial, which existed at the time that the vendee took possession.
>
> § 353. UNDISCLOSED DANGEROUS CONDITIONS KNOWN TO VENDOR
>
> (1) A vendor of land who conceals or fails to disclose to his vendee any condition, whether natural or artificial, which involves unreasonable risk to persons on the land, is subject to liability to the vendee and others upon the land with the consent of the vendee or his subvendee for physical harm caused by the condition after the vendee has taken possession, if
>
> > (a) the vendee does not know or have reason to know of the condition or the risk involved, and
> >
> > (b) the vendor knows or has reason to know of the condition, and realizes or should realize the risk involved, and has reason to believe that the vendee will not discover the condition or realize the risk.
> > . . . .

As explained in *Wilson*, any liability of the vendors must come under

Section 353:

> The fact is, after sale and delivery of possession of the
> land in question, it became of no consequence that a
> dangerous condition (if any there was) existing thereon at
> the time of the transaction was natural or unnatural, or
> that it was created by an intentional or unintentional act,
> or that it originated by the act of the [vendors], their
> agent, or an independent contractor. . . .
>
> . . . [T]he ultimate issue as to the [vendors'] liability is
> whether or not they, at the time of selling the property,
> knew or should have known of a dangerous condition
> that might lead to fire and of which the purchaser and
> tenants would not reasonably have been expected to
> appreciate.

*Wilson*, 774 S.W.2d at 449. The Court concluded that the vendor who hired a non-

electrician contractor to install an air conditioner, believing the contractor could do

the job, where the vendor did not know the air conditioner had been installed

incorrectly, should have been granted summary judgment. *Id.*

Under the common law, a condition need not be dangerous to require

disclosure if it diminishes the value of the home sold and cannot be discovered by

potential sellers. Therefore, in *Weikel*, 134 S.W. at 909, the Court ruled the seller

committed fraud where the seller sold a house with a concealed sewage pit beneath

it. Although the seller claimed ignorance that the location of the sewage would

render the house unfit for occupation, the Court ruled that the seller "knew enough

facts to put a reasonable man on notice, and when he sold an innocent purchaser

-32-

the house, causing him a loss by reason of the concealment of the facts, the loss should fall on him, and not on the purchaser." *Id.*

Similarly in *Kaze v. Compton*, 283 S.W.2d 204, 208 (Ky. 1955), where there was evidence that the sellers knowingly built and sold a house over a concealed drainage tile which caused water to bubble up from the ground under the house after the rain, "the condition was substantial or vital enough to place a duty upon the vendors to disclose it."

In contrast, if the sellers do not know of the defect and simply give an opinion rather than a misrepresentation of a material fact, they cannot be liable. *Church v. Eastham*, 331 S.W.2d 718, 719 (Ky. 1960); *Bunch v. Bertram*, 219 Ky. 848, 294 S.W. 805, 808 (1927). Therefore, when the evidence was that the sellers had the plumbing installed by a contractor and the sellers did not know of the plumbing problems that the bathtub, commode, wash basin, and kitchen sink were all unvented and the sewer pipe improperly installed, but had made the statement that the house had "good plumbing," that was a matter of opinion rather than a representation. *Church*, 331 S.W.2d at 719.

Unlike the situations in *Weikel* and *Kaze*, there is absolutely no evidence that the Thompsons had any knowledge that there was a defect, latent or otherwise, in the electrical wiring as corrected by Clark. Nationwide is evaluating the duty of the Thompsons based on hindsight, knowing that a fire occurred which

-33-

was traced to a faulty wiring connection. While with hindsight the Thompson Trust's action of hiring Clark to rewire the bedrooms may appear to be ill-advised, not all ill-advised actions result in legal liability. The fact that a fire occurred does not necessarily mean that the Thompsons concealed a defective condition and omitted making needed disclosures.

This situation is distinct from those in which fraud has been found, because just like the vendors in *Wilson*, there is absolutely no evidence that any of the Thompsons knew that the repair was dangerous. All the evidence is that Brandon, acting on behalf of Jean, helped arrange for a repair in an effort to make the wiring of the house safer and work better. Brandon testified during his deposition that his mother decided to have the electrical work done to the attic because the existing "wiring was old" and "there was one area that had some exposed connections."[8] According to Brandon, Jean hired Clark to rewire the

---

[8] Brandon's relevant deposition testimony was as follows:

> Q.    **Briefly, what was the reason to do any electrical work inside**?
>
> A.    Just the nature of the age of the home, and some of the electrical work that was – was existing appeared to be not up to what I would consider code, not that I know the electrical code, but
>
> Q.    **But as far as what you could see, what was wrong with it**?
>
> A.    Some of the wiring was just old. There was – there was one area that had some exposed connections.

bedrooms after Clark volunteered that he could do the repairs and Brandon and Jean had some basis for thinking Clark could do the repairs as he had repaired other things for them before. Additionally, Brandon knew that Clark worked for a company that made electrical wiring harnesses for automobiles, the implication being that Clark had at least some knowledge about electrical wiring.

Nationwide failed to present any evidence that Brandon or Jean had any reason to believe the replaced wiring was improperly connected to the existing wiring, had any motivation to have the bedrooms rewired in an unsafe manner, or that they experienced any problems with the new wiring after it was installed to put

---

Q. **Was the decision made to just redo it all because you could see some areas that were wrong**?

A. That was – the original decision was to do it that way, and then what was actually done was just a portion of the home.

. . .

Q. **So you're saying in your opinion, you thought that electrical wiring, existing electrical components that you could see within the house, looked like they needed repairs**?

A. There was – there was one area that – that had, you know, wires that looked like they were possibly loose.

Q. **Okay. Would you agree that improper or deteriorating electrical work would be a safety hazard**?

A. Yes . . . I think the rest of the home was just fine. The house, you know, it didn't have any electrical – it didn't have any actual electrical problems. It didn't have any – any sparks; there was no fluttering or anything like that. Just one area that went – the two rooms upstairs were being repaired and remodeled.

-35-

them on notice of a potential defect. Generally, if something works correctly after it is repaired, the assumption is that it has been done correctly. Additionally, Jean continued to reside in the house after the wiring repairs, which is some evidence she must have believed the new wiring to be safe.

Simply put, the Thompsons had no basis for knowing that the wiring was connected incorrectly; the only evidence is that they believed the new wiring to be superior to what it replaced and made the home safer. Lacking all knowledge of a latent defect, the Thompsons could not fraudulently omit what appeared to be an immaterial fact at the time – who replaced the wiring and his professional qualifications or lack thereof. They certainly had no basis for disclosing anything about a wiring defect that they themselves did not know existed. Therefore, there was no duty to tell the Fishers anything about who rewired the house or that the rewiring was defective. Therefore, summary judgment was properly granted to the Thompsons.

## CONCLUSION

Accordingly, we affirm the Cumberland Circuit Court's grant of summary judgment to Messenger and the Thompsons.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Donald J. Hass
Louisville, Kentucky

BRIEF FOR APPELLEES
BRANDON DAY THOMPSON;
NICOLE VIVETTE THOMPSON;
JEAN THOMPSON; THE
BRANDON DAY THOMPSON AND
NICOLE VIVETTE THOMPSON
JOINT LIVING TRUST; AND THE
THOMPSON TRUST:

John C. Miller
Campbellsville, Kentucky

BRIEF FOR APPELLEE
EMORY MESSENGER:

Patrick A. Ross
Horse Cave, Kentucky